A93A0808. GREEN v. SAMS.
A93A0809. SAMS v. HARRISON et al.
A93A0810. CITIZENS & SOUTHERN NATIONAL BANK
v. SAMS et al.
A93A0811. HARRISON v. SAMS.
(433 SE2d 678)

ANDREWS, Judge.

Sams sued Green, the Citizens & Southern National Bank (C & S), and Harrison, individually and as an employee and agent of C & S, alleging the defendants conspired to tortiously interfere with and breach a written contract under which Green agreed to purchase a tract of land from Sams for real estate development. Sams also sued Green for specific performance, or, alternatively, for breach of contract. Green counterclaimed against Sams for return of earnest money paid under the contract, and cross-claimed against Harrison and C & S seeking reimbursement from his co-defendants on the basis of indemnity or contribution for any judgment for damages rendered against him in favor of Sams.

The main parcel of land at issue is approximately 39 acres, zoned for residential development, and lying adjacent to Hines subdivision, an existing residential development in Clarke County. The 39-acre

tract was landlocked, without ingress or egress to a public road. Sams, a real estate broker, purchased the main tract and obtained two adjacent residential lots in Hines subdivision. He prepared a preliminary subdivision plat proposing that an access road be built over the two Hines subdivision lots connecting the main tract to a road in Hines subdivision. Sams took no action to develop the property. In March 1987, shortly after the preliminary plat was prepared, Sams received a letter from Harrison, who lived in Hines subdivision directly across the street from the two lots Sams proposed to use to provide access. Harrison was also an officer at C & S with supervisory control over the Athens branch of the bank. The letter stated that Harrison objected to the proposed use of the two lots to build an access road, and informed Sams that in Harrison's opinion subdivision restrictive covenants over the lots would prohibit construction of the road. The letter also stated that a one-foot-wide buffer strip of land had been reserved along the side of the subdivision lots abutting the tract proposed for development for the purpose of protecting Hines subdivision from encroachment from the adjoining property. The letter did not indicate Harrison would file suit or take other action against any proposed development. Sams took the letter to his attorney, who advised him that these access problems had already been considered when he purchased the property; that Harrison's objections had no merit, and that nothing pointed out in the letter was a legal impediment to building an access road across the two lots. Sams did not respond to the letter.

Subsequently, Sams was contacted by a real estate agent about the possibility of selling the property for development to Green, a real estate developer. The sales negotiations between Sams and Green were conducted by two real estate agents, both of whom were listed as Sams' agents in the eventual sales contract, who conveyed offers and counter-offers between the parties. Sams and Green never met or spoke until the closing date. During the negotiations, Sams did not inform Green or the real estate agents about the letter he had received from Harrison, or about any potential problems with access to the property. Nevertheless, as attachments to the initial proposed sales contract, Green was provided with a copy of the proposed development plan indicating access across the subdivision lots, and a copy of a portion of the recorded plat of Hines subdivision showing the lots included in the sale, and reflecting the reservation of a one-foot buffer strip between the lots and the proposed development. Although Green testified that prior to signing the final sales contract he had no knowledge of a one-foot buffer or restrictive covenants which might cause potential access problems, it is clear he was concerned with access prior to signing the contract. In the initial offer made by Green, the sales contract contained a specific stipulation providing that the

sale was contingent upon Green being allowed ingress and egress through the Hines subdivision lots. One of the real estate agents testified that Green requested this contingency because he was aware of problems in a previous development over placing a road across subdivision lots. Sams would not agree to this contingency, preferring that Green investigate access for himself prior to entering into the contract. Without the contingency regarding access, Green testified that, before signing the final sales contract, he satisfied himself that he could get the proposed access through the Athens/Clarke County Planning Commission, which was charged with approving the development. The second real estate agent involved in the negotiations testified that at Green's request he spoke to a Planning Commission member and reported to Green that they determined the building codes and subdivision restrictions would not prevent the access road across the lots. In addition to being a real estate developer, Green was himself a member of the Planning Commission, and was aware that proposing access through Hines subdivision might arouse complaints from residents of the neighborhood. He made no effort to contact any residents of Hines subdivision. There is no evidence Green made any effort prior to signing the sales contract to have the title examined, or to otherwise check public records with regard to the proposed access across the subdivision lots.

Green and Sams eventually signed a sales contract dated February 20, 1988 for the main parcel plus the two lots in Hines subdivision. The contract contained no contingency as to access across the subdivision lots, nor was it contingent upon Green's ability to obtain a loan for the purchase price. The contract did, however, provide that it was contingent on Sams' ability to furnish marketable title, subject only to zoning affecting the property, easements of record, subdivision easements and restrictions of record, and any other restrictions and encumbrances specified in the contract. Marketable title was defined under the contract as "such title as a title insurance company, licensed to do business in the State of Georgia, will insure for its regular fee on American Land Title Association's Owner's Policy, Form B-1970, copyright 1969, with no exceptions, except those set out in said preprinted form and those set out in this contract." The contract otherwise gave Green a reasonable time to have title to the property examined, and to furnish Sams with a written statement of any objections affecting title. Upon Sams' failure to satisfy such objections within a reasonable time, the contract provided Green was entitled to cancel the sale.

After signing the sales contract, Green had his attorney search the title. His attorney immediately identified the one-foot buffer and restrictive covenants as potential problems to access over the subdivision lots, and contacted Sams' attorney to discuss the matter. There

was evidence that the one-foot buffer strip, although shown as re-served from the lots on the subdivision plat, had in fact been con-veyed as part of the lots rather than retained as a buffer. This evi-dence, along with other evidence of legal authority for road access over restricted subdivision lots, convinced the parties that these mat-ters were not a legal impediment to the proposed access road. During these discussions, neither Sams nor his attorney mentioned the March 1987 letter Sams had received from Harrison. Green's attorney discussed these matters with Green prior to the closing date, which had been extended to April 15, 1988, and it was concluded that as long as title insurance could be obtained, without any exception to access, there were no title problems which would prevent conveyance of marketable title and impede the closing. Green's attorney, an agent for various licensed title insurance companies, contacted two of these companies to explain the situation with regard to access across the lots. The first company declined to issue title insurance without an exception as to access. In consultation with the second company, Green's attorney was able to get clearance for issuance of title insur-ance without exception to the proposed access. Based on this, Green made no objections as to title problems prior to the April 15 closing date.

Evidence showed Green had contacted C & S to obtain a loan for the closing, and had received a verbal commitment for the loan to be followed by written confirmation. Green's attorney began to prepare the closing documents based on the verbal commitment and informa-tion obtained from the bank's loan officer. Other evidence showed that C & S required mortgagee's title insurance as a condition for the loan. On April 15, the date of the closing, but prior to issuance of a written loan confirmation, Harrison learned that the Athens C & S branch, over which he had authority, was about to fund a loan to Green for development of the property with a proposed road access over the subdivision lots across the street from his residence. Harri-son testified that, especially in light of his position at the bank, he felt his private objection to development of the property was informa-tion relevant both to the bank and to the parties to the transaction, which should be revealed prior to the closing. Accordingly, he testified he told the loan officer that his objections needed to be conveyed to the parties before the closing proceeded. Other testimony showed that after Harrison learned of the loan, he threatened to sue or take other legal action, in his individual capacity, to stop the development, and on the day of the closing C & S withdrew its verbal commitment to fund the loan. Subsequently, on April 27, C & S sent an unsolicited written loan confirmation to Green, subject to being provided mortga-gee's title insurance.

The parties and their attorneys met on April 15 to discuss the

situation in light of Harrison's threat to sue, and the bank's withdrawal of its verbal loan commitment. At this meeting, Green learned for the first time of Harrison's March 1987 letter. The closing date was extended by agreement to May 3, 1988 on the same terms and conditions. Green's attorney subsequently informed the title insurance company of Harrison's threat to sue or take other legal action. After reassessing the access situation along with the added threat of litigation, the title company withdrew its authorization to issue a policy without exception as to access. On April 25, 1988, Green's attorney informed Sams' attorney in writing that Green would not close on the property because of title problems which had rendered the title unmarketable under the terms of the sales contract. Specifically, the title objections stated in the letter were that the threat of litigation, added to the previously discussed potential access problems concerning the one-foot buffer and restrictive covenants over the lots, had caused the title to be unmarketable because the title was not one which a title insurance company will insure as defined in the sales contract. Sams took no action to satisfy or otherwise respond to Green's title objections prior to the May 3 closing date.

In Case No. A93A0808, Green appeals from two summary judgment orders: (1) the grant of partial summary judgment against him and in favor of C & S; and (2) from the denial of his motion for summary judgment against Sams.[1]

In Case No. A93A0809, Sams cross-appeals from two summary judgment orders: (1) the grant of partial summary judgment against him and in favor of Harrison; and (2) from the denial of his motion for partial summary judgment against Green.

In Case No. A93A0810, C & S cross-appeals from three summary judgment orders: (1) the denial of its motion for summary judgment against Sams based specifically on claims of fraud and rescission of the contract; (2) from the denial of its motion for summary judgment on all issues on Sams' complaint; and (3) from the denial of its motion for summary judgment against Green's cross-claim for contribution.

In Case No. A93A0811, Harrison cross-appeals from two summary judgment orders: (1) the denial of his motion for summary judg-

---

[1] The direct appeal by Green from the trial court's December 17, 1991 order granting partial summary judgment against him supports consideration of the remaining appeals not otherwise directly appealable in this action, which are tied to the direct appeal. The otherwise non-direct appeals assert related claims in the same action, and on which summary judgment was contemporaneously denied or granted in the same court order. *Southeast Ceramics v. Klem*, 246 Ga. 294 (271 SE2d 199) (1980); *Costanzo v. Jones*, 200 Ga. App. 806, 811 (409 SE2d 686) (1991); OCGA § 9-11-56 (h); compare *Fulton v. Pilon*, 199 Ga. App. 861, 862 (406 SE2d 517) (1991). Accordingly, Sams' motion to dismiss these appeals for lack of appellate jurisdiction is denied.

ment against Sams based specifically on claims of fraud and rescission of the contract; and (2) from the denial of his motion for summary judgment on all issues on Sams' complaint.

1. We first address related issues raised by Green's appeal in Case No. A93A0808 from the denial of his motion for summary judgment against Sams; C & S's appeal in Case No. A93A0810 from the denial of its motion for summary judgment against Sams on all issues; and Harrison's appeal in Case No. A93A0811 from the denial of his motion for summary judgment against Sams on all issues.

Relevant portions of these motions raised the following issues: Green claimed the sales contract was not enforceable by Sams because it was contingent upon Sams' obligation to furnish marketable title to the property; that he refused to close on the property because Sams never responded to his objections that title was not marketable; and that he did not wrongfully conspire to interfere with and breach the contract. Both C & S and Harrison claimed that they did not conspire to tortiously interfere with or breach the contract, nor were any actions they took the proximate cause of any damage claimed by Sams. C & S also claimed the sales contract was not enforceable because the title was not marketable.

The parties agreed in the sales contract that the sale was contingent on Sams' conveyance of marketable title, subject only to zoning affecting the property, easements of record, subdivision easements and restrictions of record, and any other restrictions and encumbrances specified in the contract. Marketable title was thereafter defined as such title which a licensed title insurance company will insure for its usual fee with no exceptions, other than standard title policy exceptions, and any exceptions set out in the sales contract. Sams concedes that the type of title insurance policy referred to in the warranty of title section of the sales contract typically insures ingress and egress to the property. We cannot agree that ingress and egress in this case falls under a common title policy exception to defects created, suffered, assumed or agreed to by the insured. There is no evidence Green agreed or contracted to take conveyance of the property subject to the access problem at issue, nor can this be inferred from the mere fact that Green agreed to take the property subject to subdivision restrictions. To the contrary, it is clear that Green's attorney contacted the title insurance company for the specific purpose of discussing the potential access problem, and initially obtained authorization for a policy to cover it without exception. The only exception set out in the sales contract arguably relevant is that title would be conveyed subject to subdivision restrictions. Even if we assume this exception applies to the issue of ingress and egress, the subdivision restrictive covenants were only one of the factors considered as part of the access problem.

Sams also argues that since the sales contract was not contingent upon providing access to the property, Green was not entitled to claim the title was unmarketable on the basis that title insurance could not be obtained without an exception for ingress and egress. The sales contract does not directly address ingress and egress from the property. Rather, the contract indirectly addresses this issue by allowing the purchaser to declare the title unmarketable if because of problems concerning access or any other problems affecting marketable title, which are not excepted to in the sales contract, a licensed title insurance company will not issue a standard policy, without exceptions, for its regular fee.

Prior to the closing date, Green was able to obtain title insurance over the property without exception to access. Sams and Green agree that just prior to the scheduled closing, Harrison conveyed a threat to sue over the proposed access into the property. Green's attorney immediately contacted the title insurance company with this additional information. The evidence is unrefuted that, as a result of the added factor of threat of litigation, the title insurance company withdrew authorization for issuance of title insurance. In fact, the threat of litigation alone may render a title unmarketable. "A title which exposes the vendee to litigation is not a good and merchantable one if the danger thereof is apparent and real, not merely imaginary or illusory, which may be apprehended upon the basis of some fact or truth as to which there can be no ascertainment with reasonable certainty." *Mrs. E. B. Smith Realty Co. v. Hubbard*, 130 Ga. App. 672, 675 (204 SE2d 366) (1974). A policy of title insurance has been defined as "the opinion of the insurer concerning the validity of title, backed by an agreement to make that opinion good if it should prove to be mistaken and a loss should result in consequence." Insurance Law & Practice, Appleman (1981), Vol. 9, § 5201, p. 2; see *U. S. Life Title Ins. Co. of Dallas v. Hutsell*, 164 Ga. App. 443, 445 (296 SE2d 760) (1982); OCGA § 33-7-8. Although marketable title does not necessarily mean one which a title insurance company will insure (*Keel v. Anderson*, 104 Ga. App. 296, 297 (121 SE2d 505) (1961)), here it was the agreement of the parties to define marketable title in this fashion. In this case, it appears the title insurance company, after considering the potential access problem, was at first willing to insure title, including the proposed access, but after reassessing the access problems along with the added threat of litigation, the company was no longer willing to do so without an exception.

The evidence is undisputed that, for reasons other than pre-printed standard title policy exceptions or exceptions in the sales contract, two title insurance companies refused to insure the property with no exception as to access. Green exercised his right under the terms of the sales contract to assert that title was unmarketable on

this basis, and made these title objections in a timely manner. Sams took no action to satisfy the objections, nor has he otherwise demonstrated that the property was insurable. The evidence establishes, as a matter of law, that the contract is not enforceable by Sams since he has failed to satisfy at least one condition precedent to enforcement. *Phillips v. Bacon*, 245 Ga. 814, 816 (267 SE2d 249) (1980); *Simmons v. Krall*, 201 Ga. App. 893, 895 (412 SE2d 559) (1991).

Accordingly, in Green's appeal in Case No. A93A0808, the trial court erred by failing to grant summary judgment in favor of Green on his claim that the contract was not enforceable by Sams. It follows that in C & S's cross-appeal numbered A93A0810 the trial court erroneously denied the bank's motion for summary judgment on the same issue.

Moreover, we find no basis to conclude there was a conspiracy to interfere with and breach the contract. There was no direct evidence of a conspiracy between Green, C & S and Harrison to tortiously interfere with and breach the contract. Rather, Sams relies on the circumstances, claiming Harrison used his position and influence at the bank to cause C & S to withdraw its verbal loan commitment, and that Green cooperated by subsequently refusing to close because he feared Harrison and the bank would retaliate against him by withdrawing future credit. Even assuming there was evidence Harrison may have improperly used his position and influence at the bank to cause C & S to withdraw its verbal loan commitment, the evidence shows the sale failed to close because of access problems and the threat of litigation resulting in withdrawal of title insurance and lack of marketable title, not the withdrawal of the loan commitment, which in any event was made subject to mortgagee's title insurance. On the other hand, Harrison was legally entitled to voice his private objections to the development, and to threaten suit in his individual capacity, and there was nothing wrongful in disclosure of this information to the bank and the closing parties. There is no evidence Green colluded with or succumbed to pressure from the bank or Harrison in refusing to close the sale.

The gravamen of any civil conspiracy claim is not that the defendants acted in concert to damage the plaintiff, but that such action was tortious conduct which proximately caused injury to the plaintiff. *Ray v. Atkins*, 205 Ga. App. 85, 90 (421 SE2d 317) (1992). Here, the actions taken by the defendants were either legal, or not the proximate cause of the damage alleged by the plaintiff. The circumstantial evidence pointed to by Sams from which he claims a conspiracy may be inferred is purely speculative. " '(A)n inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility.' " *Derry v. Clements*, 197 Ga. App. 173, 174 (397 SE2d 594) (1990).

Accordingly, as to Green's appeal in Case No. A93A0808; the cross-appeal of C & S in Case No. A93A0810; and Harrison's cross-appeal in Case No. A93A0811, the evidence shows, as a matter of law, that none of the co-defendants acted alone or in a conspiracy to tortiously interfere with and cause the breach of the sales contract. The trial court erred in denying summary judgment in favor of Green, C & S and Harrison on this claim.

2. In view of the above rulings, it is unnecessary to address any other defenses to enforcement or specific performance of the contract, nor need we address any claims relating to the amount of or responsibility for damages. Accordingly, Sams' cross-appeal number A93A0809 claiming the trial court erred by denying his motion for partial summary judgment against Green's other defenses, and by granting partial summary judgment against him in favor of Harrison on a damage issue is dismissed as moot. Green's appeal in Case No. A93A0808 from the grant of partial summary judgment in favor of C & S on his cross-claim is dismissed as moot, along with the cross-appeal of C & S in Case No. A93A0810 from the denial of its motion for summary judgment on the same cross-claim. The remaining claims of C & S and Harrison in cross-appeals A93A0810 and A93A0811 have either been addressed in Division 1 or rendered moot thereby and dismissed. OCGA § 5-6-48 (b) (3).

*Judgment reversed in part and case dismissed in part in Case No. A93A0808. Case No. A93A0809 dismissed. Judgment reversed in part and case dismissed in part in Case No. A93A0810. Judgment reversed in part and case dismissed in part in Case No. A93A0811. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED JUNE 28, 1993 —
RECONSIDERATION DENIED JULY 14, 1993 — ▮▮▮▮▮▮▮▮

*Galis & Packer, Denny C. Galis, Kennedy R. Packer*, for Green.
*Winburn, Lewis & Barrow, Gene Mac Winburn, John J. Barrow, Gerard & Matthews, William T. Gerard*, for Sams.
*Chilivis & Grindler, Nickolas P. Chilivis, John K. Larkins, Jr.*, for Harrison.
*Erwin, Epting, Gibson & McLeod, Larry V. McLeod, Andrew H. Marshall*, for C & S.

