A96A1851. GREENE v. JENKINS et al.
(481 SE2d 617)

SMITH, Judge.

In March 1991, John Greene, Jr. and Michael Byrd met at a nightclub in Albany, Georgia. Sometime that night, or during the early hours of the next morning, they left the club together in a Jeep that belonged to Byrd's mother and stepfather, Sandra and Jerry Jenkins. The Jeep was involved in an accident.[1] Greene brought this action against Jerry and Sandra Jenkins, alleging that they negligently entrusted their vehicle to Byrd, knowing he had been drinking and was exhausted, and that their negligence caused him to suffer injuries when the vehicle struck a tree. In two amended complaints, Greene also alleged that Byrd was an agent or family member of the Jenkinses and that his negligence was imputed to them as principals. Greene and Byrd each claimed that he was a passenger in the Jeep and that the other was driving.[2] The trial court granted summary judgment to the Jenkinses, concluding that Greene could not recover under a negligent entrustment theory and that the Jenkinses were not liable under the family purpose doctrine. This appeal ensued.

1. Greene enumerates as error the trial court's conclusion that he could not recover against the Jenkinses under a negligent entrustment theory. This doctrine provides that "a party is liable if he entrusts someone with an instrumentality, with *actual knowledge* that the person to whom he has entrusted the instrumentality is incompetent by reason of his age or inexperience, or his physical or mental condition, or his known habit of recklessness. [Cits.]" (Emphasis supplied, footnote omitted.) *Gunn v. Booker*, 259 Ga. 343, 347 (3) (381 SE2d 286) (1989). Here, Greene did not claim that the

---

[1] Byrd subsequently died of unrelated causes on December 3, 1992.

[2] We note that *Greene* was convicted of DUI as a result of this incident. See *Green [sic] v. State*, 207 Ga. App. 800 (429 SE2d 169) (1993). During the trial of the criminal case he claimed, as he does here, that he was a passenger in the vehicle when he and Byrd left the nightclub.

Jenkinses had knowledge of a "habit of recklessness" but sought imposition of liability on a theory that Byrd's mental condition caused him to be incompetent to drive. It was therefore incumbent on Greene to show that the Jenkinses had actual knowledge that Byrd was incompetent to drive due to intoxication and/or exhaustion. See *Bragg v. Over & Under Gen. Contractors,* 148 Ga. App. 227, 228-229 (2) (251 SE2d 1) (1978).

Construed in Greene's favor, evidence was presented that Byrd and the Jenkinses went out to dinner, to a country club, and to a nightclub in Albany known as "P-2" upon Byrd's surprise return earlier that day from two years of military service in Germany. Ms. Jenkins testified that she and her husband left with friends a short time after they arrived at P-2, while Byrd stayed on and visited with his own friends, including Greene. With Mr. Jenkins's acquiescence, she left their Jeep keys with Byrd. Although Ms. Jenkins knew that Byrd had drunk two beers before they went to P-2, she did not know whether Byrd had ordered drinks at P-2 because he sat at another table with friends. Ms. Jenkins's unequivocal affidavit testimony was that at the time she gave Byrd keys to the Jeep, he "did not appear in any way to be incapable of driving safely."

Also, Greene was not present when Ms. Jenkins gave Byrd the Jeep keys, and he admitted that he was not aware of Byrd's condition at that time. Despite Greene's assertion that the Jenkinses knew that Byrd had "been drinking all night" because Ms. Jenkins "said so," he admitted that he had no evidence regarding the Jenkinses' knowledge of the amount of alcohol Byrd had that night. He further admitted that he had no knowledge that at the time Ms. Jenkins gave Byrd the keys Byrd was "so exhausted or tired that he would have been incapable of driving." In fact, Greene stated that he would not have ridden with Byrd if he believed that Byrd was too intoxicated or exhausted to drive, or if he thought that Byrd was an unsafe driver. Consequently, the evidence is uncontradicted that at the time Ms. Jenkins turned the Jeep keys over to Byrd, even though she knew he had been drinking, she did not have actual knowledge that he was incompetent to drive because of intoxication or exhaustion. Because it was incumbent on Greene to show *actual knowledge* that Byrd was incapable of driving, Greene's claim for negligent entrustment fails. *Cotton v. Toole,* 183 Ga. App. 547 (359 SE2d 368) (1987) (physical precedent only) (no evidence that entruster had actual knowledge of entrustee's state of intoxication at time of entrustment). See also *Gunn v. Booker,* supra, 259 Ga. at 346-347 (3).

2. Greene also enumerates the trial court's conclusion that the Jenkinses were not liable under the family purpose doctrine. To impose vicarious liability on the owner of a vehicle for the alleged negligence of the driver of the vehicle under the family purpose doc-

trine, one must show four factors: (1) the non-negligent defendant has an interest in or control over the vehicle; (2) he or she made the vehicle available for family, rather than business, use; (3) the driver must be a member of the defendant's immediate household; and (4) the vehicle must have been driven with the defendant's permission or acquiescence. *Wingard v. Brinson,* 212 Ga. App. 640, 641 (1) (442 SE2d 485) (1994). These factors "are necessary preconditions" to imposition of vicarious liability. Id. The trial court concluded that one of these preconditions was not satisfied — that Greene failed to establish that Byrd was a member of the Jenkinses' immediate household when the accident occurred. We agree.

Ms. Jenkins testified via affidavit that on March 23, 1991, the date of the accident, Byrd had just been discharged from the military. Between his June 1986 high school graduation and joining the armed services in May 1988, Byrd enrolled in Georgia Southern College, worked, and paid his own tuition. While working and attending college in Statesboro, he moved into his own home and rented it at his own expense. He removed all of his personal belongings from the Jenkinses' household. In September 1990, while Byrd was in the military, the Jenkinses and their two children then living at home moved from their Oak Hill Farms address where Byrd had lived until he graduated from high school into a home on Archie Way in Leesburg, where they resided when the accident occurred. That home had three bedrooms, all fully occupied by Mr. and Mrs. Jenkins and their two younger children. Byrd never had a room at that residence. Ms. Jenkins further testified that she considered Byrd "in 1991 and earlier to be independent and not subject to my management and control nor that of his step-father, Jerry Jenkins." She stated that "Byrd never lived or resided in the home located at Archie Way and was not considered a member of our household at that address." She also testified that "[o]n the day before the incident of concern in this lawsuit, Michael Byrd came to our house to visit. He did not come to live or reside." Ms. Jenkins's daughter similarly testified via affidavit that Byrd never lived at the Archie Way address and was not a part of the immediate household.

Although the record does not show where Byrd established a permanent residence after his discharge from the military, it does reveal that he was not a member of the Jenkinses' immediate household when the accident occurred. He moved out of the Jenkinses' home into a house in another town and paid the rent himself long before the accident occurred, and he then joined the armed services and lived in Germany. Although he may have visited the Jenkinses at their Archie Way residence when he returned from Germany, the record does not reveal that Byrd was a member of the immediate household when the accident occurred.

We are not persuaded by Greene's attempts to show the existence of factual issues as to whether Byrd was a member of the household. He points to several documents, including military records, a motor vehicle report, and a voter registration list referencing a P.O. Box 565 or Oak Hill address, where Byrd lived before he graduated from high school and before the Jenkinses moved to Archie Way. These documents create no material issues; several were dated over two years before the accident occurred and before the Jenkinses moved to the Archie Way address. The others simply provided a post office box. Neither those documents prepared before the accident nor even those dated after the accident provide insight as to whether Byrd was a household member at the *Archie Way* address.

Greene also points to Byrd's signed statement, made several days after the accident, in which his address was handwritten as P.O. Box 565, Archie Drive, Leesburg. This handwritten language followed the printed language "I live at." In this statement is the recitation "I do remember bits and pieces of the trip home as a passenger." Greene further references Byrd's testimony, at Greene's implied consent hearing, that "[w]e left our house and went to the Moose Lodge" on the night of the accident. We note first that Byrd's testimony at Greene's implied consent hearing was not admissible in this case. See *Green v. State*, 207 Ga. App. 800, 801 (429 SE2d 169) (1993). Even if admissible, Byrd's testimony and statement do not reveal the *Jenkinses'* intent concerning Byrd's residence; as an adult, Byrd could only reside at his parents' "home with their permission and consent. After majority there is no parental obligation to maintain, protect or support a child. [Cits.]" *Tuttle v. America First Ins. Co.,* 187 Ga. App. 68 (369 SE2d 342) (1988).

Finally, Greene points to the Jenkinses' use of the word "home" and thereby attempts to show the existence of material issues of fact concerning Byrd's status as a member of the Jenkinses' immediate household. He points to a written statement, purportedly made by Ms. Jenkins, in which she recites that she asked Byrd "how he got home." He also references Ms. Jenkins's testimony at the implied consent hearing in Greene's criminal case that she did not know Byrd was "coming home" from the military and that he "got home late" in the afternoon. Similarly, she testified at that hearing that the night of the accident "was his first night home." She remembered thinking to herself while still at the P-2 that Byrd would "be home shortly," and when she gave Byrd the keys, she told him to "come home with the vehicle." In response to a question concerning when she realized Byrd had not arrived home, she responded, "When you have a child out you just never quite sleep until they're home." Mr. Jenkins made similar statements about Byrd's having arrived home from the military.

In light of Ms. Jenkins's unequivocal testimony concerning Byrd's residence, these references do not evidence any intent by the Jenkinses that Byrd become a resident of their immediate household upon his return from Germany. First, we are not convinced that Greene properly introduced Ms. Jenkins's statement and testimony, which were from *another case*.[3] Even assuming that Greene properly introduced this testimony, however, Ms. Jenkins's affidavit recited that Byrd was *not* a member of the Archie Way household and that he had never lived there. Greene points to nothing rebutting this direct evidence but instead urges us to infer from their use of the word "home" that the Jenkinses permitted Byrd to become a member of their household. While it is *possible* that the Jenkinses' use of the word "home" is as contended by Greene, it is equally likely that the term was used in the most generic, idiomatic, and colloquial of senses — as when adults speak of going "home for the holidays," or when parents refer to their adult children as coming "home to visit," or when nostalgic moments bring to mind memories of "home sweet home." The inference that Greene asks us to draw is based on the merest of speculation concerning the use of the word "home." And as aptly noted by the trial court, speculation and conjecture cannot form the basis of an inference. See *Green v. Sams,* 209 Ga. App. 491, 498 (1) (433 SE2d 678) (1993). Greene simply has presented no competent evidence rebutting the unequivocal testimony that Byrd never lived at the Archie Way address, and the trial court did not err in granting the Jenkinses' motion for summary judgment with regard to the family purpose doctrine.

*Judgment affirmed. Andrews, C. J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED FEBRUARY 14, 1997.

*Ralph L. Phillips*, for appellant.

*Cannon, Meyer von Bremen & Meier, Michael S. Meyer von Bremen*, for appellees.

---

[3] He did not, for example, cross examine Ms. Jenkins regarding her use of the word "home," as prior inconsistent testimony. See OCGA § 24-9-83. Instead, he merely attached her statement and portions of her testimony to the record in response to the Jenkinses' motion for summary judgment.