**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 11, 2012**

# In the Court of Appeals of Georgia

A12A0704. MACKE v. CADILLAC JACK, INC. et al.           DO-033

A12A0376. ZIONS FIRST NATIONAL BANK v. MACKE.           DO-017

DOYLE, Presiding Judge.

In Case No. A12A0704, Michael Macke appeals from an order granting partial summary judgment against him and denying partial summary judgment in his favor with respect to several claims he brought against Cadillac Jack, Inc. ("CJ"), Smart Games Group Corp., and Eugene Chayevsky. Macke's claims arise from the decline of CJ's fortunes after he sold a majority stake in CJ to a company controlled by Oleg Boyko, a Russian national with whom Chayevsky worked in various capacities.[1] Macke contends that the trial court erred in the following ways: (1) granting the

---

[1] Macke's complaint also named Boyko as a defendant, but Boyko has not been served.

defendants' summary judgment motion on Macke's breach of fiduciary duty claim based on (a) a restructuring of CJ's debt and (b) withholding funding from CJ in bad faith; (2) denying Macke's summary judgment motion on CJ's counterclaims alleging Macke's breach of (a) restrictive covenants and (b) fiduciary duties and the duty of loyalty; and (3) granting defendants' summary judgment motion on Macke's claim for conspiracy to wrongfully accelerate a loan from Zions First National Bank ("Zions"). For the reasons herein, we affirm in that case.

In Case No. A12A0376, Zions First National Bank appeals from the partial grant of summary judgment in favor of Macke on a wrongful foreclosure claim he filed against the Bank in connection with the suit above. For the reasons herein, we affirm in that case.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

---

[2] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

The facts of each case are essentially undisputed, but where disputes occur in the record, we view the evidence according to the standard above.

The record shows that CJ manufactures gaming equipment and was founded in 1995 by Macke, who was the president and sole shareholder of the company. In 2004, Smart Games acquired 60 percent of the shares of CJ for approximately $14 million. Smart Games is owned by Finstar Gaming Partners, L. P., a Delaware company controlled by Boyko. Macke retained his position as CEO of CJ, and in 2005, CJ hired Greg Gronau as president. In 2006, Eugene Chayevsky, Boyko's associate and the managing partner of a Finstar affiliate, obtained a seat on CJ's board of directors, joining Boyko and Macke. Between 2006 and 2008, CJ encountered increased cash-flow problems, debt was increasing, and CJ needed funding to continue to grow as planned.

Before 2008, Chayevsky had negotiated several short-term loans from various entities affiliated with Boyko to CJ, generally ranging from $1 million to $2 million at an interest rate of 12 percent. By 2008, however, CJ was in default on most if not all of that debt. Chayevsky researched options for restructuring that debt with at least one outside source, at an approximately 18 percent interest rate, with other costs and collateralization conditions. Chayevsky recommended that the company not accept

3

that loan, which loan offer was ultimately withdrawn by the lender, and instead, CJ's board (including Macke) voted to restructure the debt with loans from Boyko entities at 20 percent interest with fewer costs and conditions.

Based on CJ's highly leveraged position and its cash flow problems, CJ's valuation fell from $85 million in 2006 to approximately $2 million in 2008. As authorized by Macke's employment agreement, Boyko and Chayevsky voted to terminate Macke's employment in June 2008, and Macke's 40 percent stake was bought out for $2 million.

After his termination, Macke remained the owner of the real property leased by CJ, and he remained CJ's landlord. Zions held a security interest in the property, which was collateral for a loan assumed by Macke. Zions received an assignment of rent paid by CJ as payment on the loan, and CJ was a guarantor on the loan.

In late 2009, CJ was in contact with Zions about the possibility of purchasing Macke's loan. On December 11, 2009, CJ sent Zions a letter purporting to revoke its guaranty of the loan to Macke, which Zions treated as triggering a default. On December 22, 2009, Zions then sent a letter to Macke notifying him of the default, specifically referencing the revocation of CJ's guaranty. At the time of the default,

4

the outstanding principle was approximately $1.9 million and the property was valued in the range of $2.18 million and $3.35 million.

Thereafter, Zions foreclosed on the property and granted CJ a full release and dismissed with prejudice a confirmation petition against CJ as guarantor. The property was ultimately sold at a public auction for $2,010,513.00

Also after Macke's termination, another dispute arose about whether he breached certain restrictive covenants governing his employment with CJ. After his termination, Macke's wife formed Primero Games, a gaming company that competed with CJ in the redemption game business. Shortly thereafer, Primero hired a long-time CJ employee, Fred Benschine, and Primero began a relationship with Bluberi, a company with which CJ had enjoyed an exclusive relationship. Around the time of his termination, Macke also had conversations with the Puyallup Tribe of Indians, a CJ client, complaining about the way CJ was managing funds used to pay the Tribe's gaming winners.

As CJ's business faltered and the new relationships failed, Macke filed suit in 2008 against CJ, Smart Games Group, Chayevsky, and Boyko, ultimately adding Zions Bank and alleging claims for breach of fiduciary duty, breach of contract, wrongful foreclosure, conspiracy to wrongfully accelerate the loan, and other related

5

claims. The defendants answered and brought various counterclaims including breach of contract claims based on the restrictive covenants. After conducting discovery, all parties moved for summary judgment, which motions were denied in part and granted in part. Macke appealed in Case No. A12A0704.

*Case No. A12A0704*

1. Macke first contends that the trial court erred by granting the defendants' summary judgment motion as to Macke's breach of fiduciary duty claim. He focuses on (a) the restructuring of CJ's debt and (b) the alleged withholding of adequate funding from CJ.

(a) *Debt restructuring.* Macke argues that the debt restructuring agreement, which resulted in consolidated debt at 20 percent interest, between CJ and Vigo Trading Limited, an entity controlled by Boyko, was reached pursuant to a conflict of interest on the part of Chayevsky and Boyko.

> Under OCGA § 14-2-860 et seq., upon a showing that an officer or director had a beneficial financial interest in a transaction with the corporation (such that it would reasonably be expected to influence his judgment in voting on the transaction), the burden of proof devolves

6

upon the officer or director to show that the transaction received proper approval or was fair to the corporation.[3]

Based on this rule, Macke argues that the trial court erred by granting summary judgment because the record contains factual disputes as to the fairness of the debt restructuring.

Specifically, Macke points to the fact that at around the time of the restructuring, CJ had the opportunity to obtain a loan at 18 percent interest, but Chayevskey insisted that they not pursue it, claiming that the lender was "raping" CJ at the terms offered. Macke also points to a $1.5 million personal loan Chayevsky had obtained from Boyko sources at an interest rate of only ten percent. Nevertheless, as pointed out by the trial court, these facts do not show unfairness because the 18 percent loan was premised on much less favorable conditions such as a collateralized guaranty by a Boyko entity, a prepayment penalty, a security interest in all of CJ's assets and its subsidiaries, warrants entitling the lender to an ownership interest in CJ, and $900,000 in closing costs. These terms are undisputably more onerous than the loan CJ eventually obtained from the Boyko entity, so the availability of these terms

---

[3] *Rosenfeld v. Rosenfeld*, 286 Ga. App. 61, 66 (4) (648 SE2d 399) (2007) (physical precedent only).

7

does not evince unfairness of the CJ restructuring.[4] Likewise, with respect to the personal loan obtained by Chayevsky, the amount was significantly lower, and Chayevsky did not, as CJ did, have an existing history of default on multiple loans to Boyko entities. Thus, the existence of this personal loan does not support an inference of unfairness to CJ. Accordingly, the trial court did not err by granting summary judgment on the breach of fiduciary duty claim premised on this basis.

(b) *Failure to otherwise provide adequate funding.* Macke contends that the initial sale of the majority interest in CJ was premised on the notion that Boyko would provide necessary funding to grow the company. Macke argues that when CJ faltered and Boyko failed to provide adequate funding, it evinced bad faith on the part of Boyko and Chayevsky, constituting a breach of their fiduciary duty to the company as directors. Nevertheless, Boyko, who has not been served and is not a party to this appeal, controlled the funding decisions (not Chayevsky), and it is undisputed that Boyko extended numerous multi-million dollar loans to CJ, including the

---

[4] We note that Macke conceded that CJ's existing debt to the Boyko entities was a risk to Boyko, as opposed to leverage over CJ. If that debt was accelerated, CJ could have been forced into bankruptcy, which would have threatened Boyko's investment.

8

restructuring about which Macke complains. Under these facts, the trial court did not err on this ground.

2. Macke also contends that the trial court erred by denying him summary judgment on CJ's counterclaims alleging Macke's breach of (a) restrictive covenants and (b) fiduciary duties and the duty of loyalty.

(a) *Breach of restrictive covenants*. Macke's employment agreement and shareholder agreement contained certain covenants restricting his ability to compete against CJ for a limited time frame. As noted above, in December 2008, Macke's wife set up Primero Games, LLC, which competed against CJ. The trial court found that questions of fact exist as to the extent of Macke's involvement in Primero and the business it transacted with Bluberi, a CJ vendor.

On appeal, Macke relies on sworn statements he made in an affidavit denying involvement in Primero or competing with CJ. Macke contends that because CJ's evidence to the contrary is circumstantial, the trial court erred by ignoring his affidavit.

> Circumstantial evidence may be sufficient to create a jury issue in the face of direct evidence to the contrary. Where direct and positive testimony is presented on an issue, the opposing party must show some other fact which contradicts the testimony. If this other fact is direct

9

evidence, that is sufficient to allow the case to go to the jury; if the other fact is circumstantial evidence, it must be inconsistent with the defendant's evidence, or if consistent, it must demand a finding of fact on the issue in favor of the plaintiff.[5]

Here, the record contains evidence that Macke's wife started Primero, a business that directly competed with CJ within months of Macke's termination from CJ. The record also contains evidence that shortly thereafter, Primero hired a CJ employee and began a relationship with Bluberi, a company with which CJ had an exclusive distribution agreement. There is direct testimony from Chayevsky confirming conversations CJ had with Bluberi about its allegedly competing relationships with Primero and CJ. Finally, CJ received emails, presumably by mistake, addressed to "Mike Macke at Primero Games" discussing what appeared to be Primero business. Based on this record, there is at least some circumstantial evidence supporting CJ's counterclaim based on Macke's alleged competition with CJ. Accordingly, the trial court did not err by denying Macke's summary judgment on that basis.[6]

---

[5] (Punctuation omitted.) *Jones v. Bd. of Regents of the Univ. System of Ga.*, 262 Ga. App. 75, 81 (4) (585 SE2d 138) (2003).

[6] See id.

(b) *Breach of fiduciary duty and duty of loyalty*. The trial court also denied Macke's summary judgment motion as to CJ's counterclaims that Macke was disloyal to CJ leading up to and after his termination. CJ's claims center on alleged conversations between Macke and the Puyallups Indian Tribe concerning a Wide Area Progressive Network ("WAP") gaming system. The WAP system coordinates activity among various machines placed at Indian gaming facilities. Macke deposed that around the time of his termination in 2008, he visited the Puyallups Tribe and stated that CJ was not in compliance with certain funding requirements pertaining to the Tribe's WAP system. Macke also sent an email to the Tribe with a balance sheet detailing the allegedly inadequate funding of the WAP system, informing the Tribe that CJ was quickly seeking another tribal host, and urging the Tribe to contact the other potential tribal host to slow the process.

Macke contends that CJ failed to show any evidence that this behavior caused harm to CJ. Nevertheless, the record contains evidence that the Tribe eventually ended at least one account with CJ. When construed in favor of the nonmovant, CJ, this is at least some evidence that CJ suffered harm as a result of Macke's conversations with the Puyallups Tribe, and we cannot conclude at this stage that CJ's

11

counterclaim must fail as a matter of law.[7] Accordingly, the trial court correctly

denied Macke's summary judgment motion on this ground.

3. Macke finally challenges the trial court's grant of summary judgment to the

defendants on his claim that Zions and CJ conspired to wrongfully accelerate his loan

and foreclose on the property. "A conspiracy is a combination of two or more persons

to accomplish an unlawful end or to accomplish a lawful end by unlawful means. To

recover damages for a civil conspiracy claim, a plaintiff must show that two or more

persons, acting in concert, engaged in conduct that constitutes a tort."[8]

Here, Macke points to communications between Zions and CJ in late 2009

about CJ's desire to purchase Macke's loan, which was guaranteed by CJ and which

was secured by property occupied by CJ. CJ stopped making rent payments after its

lease expired in September 2009, and in October and November, Macke failed to

make his mortgage payments. But by December, Macke had made his missed

payments and the December 2009 payment. On December 11, 2009, CJ sent a letter

to Zions purporting to revoke its guaranty, which Zions treated as triggering a default

___

[7] See *Matjoulis*, 226 Ga. App. at 459 (1).

[8] (Punctuation omitted.) *J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 560 (e) (644 SE2d 440) (2007).

clause in the loan documents. Macke learned of this in a letter from Zions on December 22 noting the default and stating that the entire loan balance – approximately $2 million – would be accelerated. The parties attempted to come to a resolution on forbearance and payment, but Zions ultimately foreclosed on the property in July 2010. After the foreclosure, Zions released CJ and dismissed with prejudice a confirmation petition against CJ as guarantor seeking a deficiency judgment on the property.

> Civil conspiracy is an act which is by its very nature covert and clandestine, and usually not susceptible of proof by direct evidence. Concert of action, amounting to a conspiracy, may be shown by circumstantial as well as direct evidence. Whether the facts shown established a conspiracy is a question of fact for the jury. Applying the rule that the party opposing the motion for summary judgment is entitled to all reasonable doubts and favorable inferences that may be drawn from the evidence, where there is some evidence – albeit circumstantial, from which a jury may infer existence of the fact to be proved, and this circumstantial evidence is in conflict with direct evidence of the movant, this conflict is sufficient to raise an issue required to be submitted to the triers of fact.[9]

---

[9] (Citations omitted.) *Mixon v. Phoenix Landscaping, Inc.*, 136 Ga. App. 344, 345 (221 SE2d 225) (1975).

13

Here, the trial court found that CJ may have been in an adversarial position to Macke when it withdrew its guaranty, thereby causing a default. Nevertheless, with respect to Zions, the trial court found an absence of evidence, circumstantial or otherwise, showing how Zions would "benefit by Macke's default and its subsequent foreclosure on the commercial property during the worst property market in decades."

As evidence to the contrary, Macke points to Zions's awareness of an appraisal showing that the property was worth more than the loan value and the fact that Zions allegedly released CJ after the foreclosure.[10] Nevertheless, despite any ill motive by CJ, the fact that Zions perceived a default and did not ultimately pursue CJ as a potential guarantor in a post-foreclosure deficiency action in this case is not sufficient to show Zion's participation in a prior common design to wrongfully default Macke.

> The gravamen of any civil conspiracy claim is not that the defendants acted in concert to damage the plaintiff, but that such action was tortious conduct which proximately caused injury to the plaintiff. Here, the actions taken by [Zions was] either legal, or not the proximate cause of the damage alleged by the plaintiff. The circumstantial evidence pointed to by [Macke] from which he claims a conspiracy may be inferred is purely speculative. An inference cannot be based upon evidence which

---

[10] The foreclosure sale brought less than the outstanding loan obligation.

14

is too uncertain or speculative or which raises merely a conjecture or possibility.[11]

Accordingly, Zions's conduct in foreclosing and excusing CJ's guaranty does not evince some earlier tacit understanding with CJ to accomplish an unlawful design, such that it entered into a civil conspiracy recognized by the law.[12]

*Case No. A12A0376*

In this appeal, Zions appeals from the trial court's grant of summary judgment to Macke on his wrongful foreclosure claim against the bank. Zions contends that the trial court erred because (1) Macke was in default, the loan acceleration was warranted, and Macke failed to pay after December 2009; and (2) the trial court's sua sponte grant of summary judgment was procedurally improper.

1. (a) *Zions's decision to default Macke*. It is undisputed that Macke was current on his loan payments as of December 10, 2009. Zion's letter to Macke informing him that he was in default was premised on CJ's revocation of its guaranty.

---

[11] (Citation and punctuation omitted.) *Green v. Sams*, 209 Ga. App. 491, 498 (1) (433 SE2d 678) (1993).

[12] Compare *Blackstone Indus., Inc. v. Andre*, 232 Ga. 715, 716 (208 SE2d 815) (1974) (civil conspiracy requires some showing "that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design.").

15

CJ's revocation came in the form of a letter to Zions stating as follows, in relevant part:

> You are further notified that, to the extent allowable under the Guaranties and applicable law, each of the Cadillac Jack Entities hereby revokes any and all guaranties of any loans, obligations or indebtedness to [Zions] whether now existing or hereafter incurred or created. Without limitation and also to the extent allowable under the Guaranties and applicable law, each of the Cadillac Jack Entities hereby revokes the Guaranties, any guaranties of the Loan, any guaranties of any indebtedness, loans or obligations of Michael Macke to Zions, and any [other] guaranties . . . to Zions or its affiliates.

The trial court ruled that this was not an effective revocation because of the conditional language "to the extent allowable," but this gives too little credit to the language in the deed defining default events to include when "any Guarantor . . . *revokes, or disputes the validity of, or liability under*, any guaranty of the indebtedness . . . ." Thus, based on this language, Zions was within its rights under the deed to treat CJ's letter as a default event.

Nevertheless, the trial court also ruled that even if CJ's revocation triggered a default, Zions wrongfully failed to give Macke an opportunity to cure the default

16

before accelerating the loan. In so ruling, the trial court relied on the following language in the security deed:

> Right to Cure. *If such a failure [event of default] is curable*, and if [Macke] has not been given a notice of a breach of the same provision of this Security Deed within the preceding twelve (12) months, *it may be cured (and no Event of Default will have occurred) if [Macke], after Lender sends written notice demanding cure of such failure*: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.[13]

This language does not explicitly address the question of whether Macke's right to cure is dependent on Zions's having sent him written notice demanding a cure, but to the extent this language is ambiguous on that question, we, like the trial court, construe it against the drafter, Zions.[14] Having done so, we conclude that Macke had a right to cure the default within 15 days (presumably by obtaining another guarantor or convincing CJ not to revoke), and Zions never gave him that opportunity before

---

[13] (Emphasis supplied.)

[14] See *Dept. of Community Health v. Pruitt Corp.*, 295 Ga. App. 629, 632 (673 SE2d 36) (2009) (a "rule of construction requires us to construe ambiguous contract provisions against the drafter").

it accelerated the debt. Zions's letter notifying Macke of the default and accelerating the debt was sent 11 days, not 15 days, after the alleged default event, and it did not allow him the right to cure the alleged default. Zions's right to accelerate is premised on a default, but since a cured default is treated as if no event of default occurred, the debt acceleration was premature without a curing period. Accordingly, Zions's December 2009 default of Macke was improper, and the trial court did not err in so holding.

(b) *Other grounds for default.* Zions also argues that because Macke never made payments after December 2009, he remained in default, which supported the subsequent foreclosure. But after the wrongful acceleration, Zions immediately demanded full payment and maintained that any payments made by Macke would be considered partial payments of the full amount owed, and it would not reinstate the terms of the payment schedule. Thereafter, Zions demanded payment of attorney fees, penalties, and late fees as preconditions of having the loan reinstated. Under the circumstances of this case, Macke's failure to make those payments cannot be

considered a separate basis for default.[15] Therefore, Macke's behavior after the wrongful acceleration did not constitute a separate basis for the foreclosure.

2. *Sua sponte grant of summary judgment.* Zions argues that the trial court erred by sua sponte granting summary judgment to Macke on his wrongful foreclosure claim because Zions was not provided notice and an opportunity to be heard on that claim.

> [A] trial court may grant summary judgment sua sponte under certain circumstances, so long as it ensures that the party against whom summary judgment is rendered is given full and fair notice and opportunity to respond prior to entry of summary judgment. While in most cases it is better practice to await a motion for summary judgment before entering it for a party, it may not be erroneous under the circumstances of a given case, where the issues are the same as those involved in the movant's motion.[16]

Here, the record shows that Zions moved for summary judgment on the wrongful foreclosure claim, and at the hearing on its motion while specifically

---

[15] See *KIXX, Inc. v. Stallion Music*, 610 P2d 1385, 1389 (Utah 1980) (defendant was not required to tender payment of delinquent installment after wrongful acceleration). The loan documents stipulate that they are governed by the law of Utah.

[16] (Citation and punctuation omitted.) *Forsyth County v. Waterscape Svcs., LLC*, 303 Ga. App. 623, 629 (1) (694 SE2d 102) (2010).

19

addressing that claim, Zions's counsel stated, "There are no factual disputes here about what happened. There's not a question for the jury. We're arguing legal questions, interpretation of the loan documents[,] and the interpretation of the Utah Supreme Court case." Zions was fully heard on its arguments as to the interpretations of the loan documents and applicable legal precedent. Zions argues on appeal that it did not have an opportunity to present evidence showing factual disputes such as its disagreement about whether CJ was entitled to revoke its guaranty or whether CJ's failure to renew its lease was a material adverse change triggering default. Nevertheless, these arguments rest on legal issues, and based on our analysis above, they do not demonstrate error in the trial court's grant of summary judgement to Macke as to the wrongful foreclosure claim.[17]

*Judgment affirmed. Andrews and Boggs, JJ., concur.*

---

[17] See id. at 629 (1).