S06A1280. PLYMEL et al. v. TEACHERS RETIREMENT SYSTEM et al.
(637 SE2d 379)

SEARS, Chief Justice.

The appellants, Larrie Plymel and Corinne Monroe, are retired educators who are beneficiaries of the Teachers Retirement System of Georgia ("TRS"). The appellees are the TRS and its Board of Trustees. This appeal concerns, among other things, whether the TRS properly calculated the appellants' retirement benefits. The trial court granted summary judgment to the TRS and its Board, and denied partial summary judgment on liability to the appellants. For the reasons that follow, we reverse.

1. Appellant Plymel retired in 2002, and appellant Monroe retired in 1995. At retirement, the appellants had two options. They could have taken a maximum-plan allowance, which pays a fixed

---

[14] Majority opinion at 406.

monthly benefit for the life of the retiree only.[1] Instead of the maximum plan, the appellants took an optional-plan allowance, which pays a reduced allowance, first to the member during her life, and then to a person the member has named as a beneficiary after the member's death.[2] The appellants' optional-plan retirement benefits were calculated using "option factors" adopted by the TRS in 1983. Option factors are a number less than one that is multiplied by what would have been a retiree's monthly maximum-plan benefit to produce the retiree's monthly optional-plan benefit. For example, if a maximum-plan payment for a retiree of a certain age is $1,000 per month, an optional-plan allowance might be calculated based on an optional factor of .70, thus requiring a payment of $700 per month over the course of the member's life and the beneficiary's life. The difference between the member's maximum-plan payment and the reduced, optional-plan payment is used to purchase a life insurance vehicle to provide for the benefit of the member's survivor. To create option factors, the TRS's actuaries use a mortality table and an interest rate to calculate the present value of the maximum plan for a retiree of a certain age, and then, using that same table and interest rate, to calculate an option factor that is designed to result in benefits payable to the member and her beneficiary that would equal the present value of the benefits under the maximum plan to the member only.

2. The dispute in this case arises from the requirement of OCGA § 47-3-121 (a) that an optional-plan allowance such as that chosen by the appellants must be actuarially equivalent to the maximum-plan allowance that the member could have chosen.[3] In this regard, OCGA § 47-3-1 (2) defines the term "actuarial equivalent" to mean "a benefit of equal value when computed at regular interest upon the basis of the mortality tables last adopted by the board of trustees." The parties agree that, to determine if an optional-plan allowance is the actuarial equivalent of a maximum-plan allowance a member could have selected, the benefits payable under both allowances must be reduced to their present value using the same interest rate and mortality table. As the foregoing illustrates, to determine actuarial equivalence, one needs to know the "mortality tables last adopted by the board of trustees."[4] OCGA § 47-3-23 (b) is relevant to that inquiry. It provides as follows:

---

[1] OCGA §§ 47-3-120 (a); 47-3-121 (a).

[2] See OCGA § 47-3-121 (b)-(e.1).

[3] OCGA § 47-3-121 (a) provides that a plan member may elect to convert the "[maximum plan] allowance, otherwise payable to him, into a modified retirement allowance of equivalent actuarial value in accordance with one of the optional forms named below."

[4] OCGA § 47-3-1 (2).

(b) From time to time, but at least once in every five-year period, the actuary shall make an actuarial investigation into the mortality, service, and compensation experience of the members and beneficiaries of the retirement system and recommend for adoption by the board of trustees, mortality, service, and other tables needed in the operation of the retirement system. Taking into account the results of such investigations, the board of trustees from time to time shall adopt for the retirement system such mortality, service, and other tables as it shall deem necessary for use in all calculations required in connection with this retirement system.

Pursuant to OCGA § 47-3-23 (b), the TRS's principal actuary conducted a review of the retirement system in 1982, 1986, 1992, 1996, and 2000, and the board of trustees adopted new mortality tables in those years based on the actuary's recommendation.

3. From 1983 to February 1, 2003, the TRS used option factors adopted by it in 1983 to calculate optional-plan benefits, and the TRS has stated that it does not know what mortality table was used to calculate the 1983 option factors. However, for plan members retiring after February 1, 2003, the TRS adopted a new set of "option factors," based on the new mortality table adopted in 2000, that has resulted in increased benefits payable under the optional plans. The increase in benefits is due to the fact that the new mortality table reflects a longer life expectancy than was reflected in the mortality table used to calculate the option factors adopted in 1983. Because an option factor is essentially a life insurance vehicle, if a member's life expectancy increases, she has a longer period of time during which to purchase the life insurance benefit for her survivor, thus decreasing the reduction necessary from the member's maximum-plan payment and increasing the payments under the optional plans.

In April 2004, the appellants brought this action, contending that the monthly benefits they were being paid under their optional-plan allowances were less than the actuarial values of the maximum-plan allowances they could have chosen, and that this discrepancy constituted a breach of contract. More specifically, the appellants contended that the TRS should have calculated their optional-plan benefits based on mortality tables last adopted by the board pursuant to OCGA § 47-3-23 (b); that, instead, the TRS calculated their benefits under an unknown mortality table used to create the 1983 option factors; and that the failure to use the more current mortality tables resulted in their optional-plan allowances not being actuarially equivalent to the maximum-plan allowances they could have chosen. They also raised several constitutional claims in the event they did not prevail on their breach of contract claims. The trial court granted

summary judgment to the TRS, and denied the appellants' partial motion for summary judgment as to liability.

4. The appellants contend that the trial court erred by granting summary judgment to the TRS on their breach of contract claim. For the reasons that follow, we agree.

" '(A) statute or ordinance establishing a retirement plan for government employees becomes a part of an employee's contract of employment if the employee contributes at any time any amount toward the benefits he is to receive, and if the employee performs services while the law is in effect.' "[5]

In the present case, several statutes are relevant to the appellants' breach of contract claim. As previously noted, one is OCGA § 47-3-121 (a), which required the appellants' optional-plan allowances to be actuarially equivalent to the maximum-plan allowances they could have chosen. The parties' chief dispute, however, concerns the interplay between OCGA § 47-3-1 (2) and OCGA § 47-3-23 (b).

(a) In this regard, the appellants contend that, under OCGA § 47-3-1 (2), the actuarial equivalence between the optional-plan benefits they chose and the maximum-plan benefits they could have chosen had to be calculated based on the "mortality tables last adopted by the board of trustees";[6] that the mortality tables last adopted by the board of trustees were the ones adopted by the board in 1982, 1986, 1992, 1996, and 2000; and that those mortality tables had to be "use[d] in all calculations required in connection with [the] retirement system,"[7] including the calculation of the actuarial equivalency between the appellants' optional and maximum plans. The appellants, one of whom retired in 1995 and one of whom retired in 2002, put in evidence from their actuarial expert that their optional-plan benefits were not actuarially equivalent to their maximum-plan benefits using the mortality tables adopted in 1992 and 2000, respectively, under OCGA § 47-3-23 (b).

(b) The TRS, on the other hand, contends that tables adopted in 1982, 1986, 1992, 1996, and 2000 were adopted only for the purpose of determining the valuation of the TRS system and not for the purpose of calculating actuarial equivalence. More specifically, the board contends that the use of the word "operation" in the first sentence of OCGA § 47-3-23 (b)[8] equates to "valuation" of the retirement system, and that the first sentence of OCGA § 47-3-23 (b)

---

[5] *Arneson v. Board of Trustees &c. of Ga.*, 257 Ga. 579, 582 (361 SE2d 805) (1987), quoting *Withers v. Register*, 246 Ga. 158, 159 (269 SE2d 431) (1980).

[6] OCGA § 47-3-1 (2).

[7] OCGA § 47-3-23 (b).

[8] OCGA § 47-3-23 (b) provides as follows:

authorized the board to adopt "tables needed in the [valuation] of the retirement system."[9] The board further contends that the use of the word "calculation" in the second sentence equates to a separate "calculation" or "administration" aspect of the retirement system, and that the second sentence of OCGA § 47-3-23 (b) grants it the authority, "from time to time," to adopt mortality tables for use in calculations of the retirement system. Finally, the board contends that the mortality tables adopted by it in 1982, 1986, 1992, 1996, and 2000, were adopted only for valuation purposes; that the board therefore did not have to use those mortality tables to conduct "calculations" required in connection with the retirement system, including calculations regarding actuarial equivalence under OCGA § 47-3-121 (a); that the board implicitly adopted the mortality table that was used to calculate the 1983 option factors; that that mortality table was the last one adopted by the board for "calculation" purposes; and that the 1983 option factors produced an optional benefit for the appellants that is actuarially equivalent to the maximum plan benefit they could have chosen. We disagree with the board's analysis of OCGA § 47-3-23 (b).

(c) Generally, the use of plain language in a statute obviates the need for judicial construction,[10] and this Court is not required to follow an agency's interpretation of a statute, if, based on our own independent determination, it does not follow the plain language of the statute.[11] Here, the first sentence of OCGA § 47-3-23 (b) sets forth the duties of the actuary for the TRS, not the duties of the board of trustees. It requires the actuary to investigate the system at least every five years and to recommend new mortality tables to the board of trustees. The second sentence of OCGA § 47-3-23 (b) sets forth the duties of the board of trustees of the TRS. That sentence directs the board to take "into account the results of such investigations" and to adopt for the retirement system "such mortality . . . tables as it shall deem necessary for use in all calculations required in connection with this retirement system." Thus, the second sentence requires that, if

---

(b) From time to time, but at least once in every five-year period, the actuary shall make an actuarial investigation into the mortality, service, and compensation experience of the members and beneficiaries of the retirement system and recommend for adoption by the board of trustees, mortality, service, and other tables needed in the operation of the retirement system. Taking into account the results of such investigations, the board of trustees from time to time shall adopt for the retirement system such mortality, service, and other tables as it shall deem necessary for use in all calculations required in connection with this retirement system.

[9] OCGA § 47-3-23 (b).

[10] *Sawnee Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 273 Ga. 702, 705-706 (544 SE2d 158) (2001).

[11] Id.

the board adopts a mortality table based on the actuarial investigations, the table must be used, not just for valuation purposes, but "in all calculations in connection with this retirement system."

Moreover, it is clear that both the valuation of the retirement system and the determination of actuarial equivalence require "calculations." As for valuation, Jeffrey Ezell, the Executive Director of the TRS, stated in his affidavit that the valuation of the retirement system requires the actuary to use mortality tables, and other assumptions, to "calculate" the obligations and liabilities of the system for current members of the system, as well as retirees; to compare that calculation to existing assets; and then to calculate the necessary contribution rates for employers and employees to fund the system. Moreover, in his deposition, the TRS's principal actuary stated that the determination of actuarial equivalence was an actuarial calculation. Furthermore, if the board's interpretation is correct, then there has not been a mortality table adopted by the board for use in making calculations required by the retirement system from at least 1983, as, although the TRS states that it implicitly adopted a mortality table to calculate the 1983 option factors, it has no knowledge of what that mortality table was. Finally, contrary to the board's interpretation that the actuarial recommendations for mortality tables are used only for purposes of valuation, there was evidence in the record that the board did use the mortality table the actuary recommended in 2000 to conduct the calculations required to determine the 2003 option factors.

Because the statute requires the board to adopt mortality tables for all calculations required in connection with the retirement system, because both the valuation of the system and the determination of actuarial equivalence require calculations, and because adopting the board's interpretation would lead to the absurd result that the board has not been aware of a mortality table to use in calculations since at least 1983, we conclude that the board was required to use the mortality tables it adopted in 1982, 1986, 1992, 1996, and 2000 to determine actuarial equivalence.

5. The trial court granted summary judgment to the TRS and its board of trustees based on the court's conclusions that the TRS did not have to use the 1982, 1986, 1992, 1996, and 2000 mortality tables to determine actuarial equivalence; that the board of trustees implicitly adopted the mortality table used in calculating the 1983 option factors; and that the 1983 option factors produced optional-plan benefits that were actuarially equivalent to maximum-plan benefits.[12] Because the trial court did not address whether, under the

---

[12] To determine actuarial equivalence, an actuary must use a mortality table to calculate

more current mortality tables, the appellants' optional-plan and maximum-plan benefits were actuarially equivalent, we remand the case to the trial court for that determination and for other proceedings consistent with this opinion, including but not limited to a resolution of issues such as whether any of the appellants' claims are barred by the applicable statute of limitations.[13]

*Judgment reversed and case remanded with direction. All the Justices concur, except Carley, J., not participating.*

DECIDED OCTOBER 30, 2006 —
RECONSIDERATION DENIED DECEMBER 15, 2006.

*Davis & Forehand, David A. Forehand, Jr., Hardy Gregory, Jr., Cook & Connelly, Bobby Lee Cook,* for appellants.
*Thurbert E. Baker, Attorney General, Annette M. Cowart, Assistant Attorney General,* for appellees.

---

the present value of a retiree's benefits under the maximum plan and the present value of the retiree's and beneficiary's benefits under the optional plan. Because the TRS has stated that it has no information regarding the mortality table that was used to establish the 1983 option factors, a mathematical calculation cannot be performed to determine the accuracy of the TRS's conclusory evidence that the 1983 option factors produce actuarially equivalent benefits. Moreover, the appellants' actuarial expert showed that the 1983 option factors did not produce actuarially equivalent benefits when the actuarial equivalence was calculated using the 1982, 1986, 1992, 1996, and 2000 mortality tables. Thus, even if we were to agree with the TRS's interpretation of the applicable statutes, it is not clear the TRS would be entitled to summary judgment on the ground that it properly calculated the appellants' retirement benefits.

[13] Because the appellants' constitutional claims are premised on our agreement with the TRS's construction of the applicable statutes, and because we have concluded that the appellants' interpretation of the statutes is correct, we need not address the appellants' constitutional claims.