### A09A1964. FORSYTH COUNTY v. WATERSCAPE SERVICES, LLC.
(694 SE2d 102)

SMITH, Presiding Judge.

Forsyth County ("the county") and Waterscape Services, LLC ("Waterscape") entered into a contract under which Waterscape agreed to design and construct a wastewater treatment plant and then to convey the plant to the county after successfully operating the plant for a minimum of three consecutive months. After the plant was constructed and became operational, Waterscape advised that it was terminating the contract because of a dispute regarding a change order, and it refused to convey the plant to the county, leading the county to commence this action for specific performance, breach of contract damages, and expenses of litigation. Waterscape answered and counterclaimed, seeking, among other things, a declaratory judgment that it had validly terminated the contract; a declaratory judgment that Waterscape enjoyed a perpetual easement by estoppel to utilize the county's permits and wastewater disposal infrastructure; and an injunction preventing the county from stopping Waterscape from using the permits and infrastructure.

The trial court denied the county's motion for summary judgment on its claim for specific performance and on the three counterclaims asserted by Waterscape, and sua sponte granted summary judgment in favor of Waterscape on the counterclaims. The county appeals these summary judgment rulings. For the reasons discussed below, we reverse and remand with direction.

Summary judgment is appropriate if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party.

(Citations and punctuation omitted.) *Ins. Co. &c. of Pennsylvania v. APAC-Southeast*, 297 Ga. App. 553 (677 SE2d 734) (2009); see also OCGA § 9-11-56 (c). Guided by these principles, we turn to the record in the present case.

*Overview of the Agreement.* On August 11, 2004, the county and Waterscape entered into the "Design-Build Agreement in Aid of Construction of a New Waste Water Treatment Plant in Forsyth County, Georgia" (the "agreement"). Waterscape agreed to design and complete construction of a new wastewater treatment facility to serve customers in the James Creek basin in Forsyth County (the "facility") within 24 months of execution of the agreement, and then to "donate" the completed facility to the county after a minimum of three consecutive months of successful operation. In return, Waterscape would be compensated out of certain payments made by third-party developers in an amount to exceed $10,000,000, and would be allowed to use the county's wastewater disposal infrastructure and obtain necessary regulatory permits using the county's name. For purposes of this appeal, the most relevant contractual provisions are those governing (1) Waterscape's payment arrangement; (2) the permitting process and related termination provision; (3) Waterscape's obligation to "donate" the facility to the county; and (4) the county's right to "buy out" Waterscape's residual compensation rights at the time of donation.

*Waterscape's Payment Arrangement.* The parties agreed that Waterscape's compensation for designing and constructing the facility would come from "sewer tap fees" and other contributions collected from third-party developers whose developments would be served by the facility. The compensation was tied to Waterscape's anticipated costs and was set at a maximum amount of $10,614,000, referred to as the "Total Tap Fee Compensation." The Total Tap Fee Compensation, however, could be increased by "future change orders requested by the County . . . agreed to in writing by both parties, whose consent shall not be unreasonably withheld or delayed."

*The Permitting Process and Related Termination Provision.* A wastewater treatment plant may only discharge its byproducts onto Georgia land or into Georgia waters in accordance with permits issued by the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD"). See Ga. Comp. R. & Regs. rr. 391-3-6-.06 (3) (a); 391-3-6-.11 (3). The parties agreed that Waterscape would obtain EPD permits "in the name of the County" and that the construction of the facility would be "deemed to be completed upon the issuance of a final start-up authorization" from the EPD.

The parties considered the issuance of two EPD permits of particular importance to the construction and operation of the

facility: an expanded Land Application System ("LAS") permit, pursuant to which a permit previously issued to the county's existing Fowler plant would be expanded to include the discharge of the byproducts from the completed facility; and a new Cold Weather Discharge ("CWD") permit for handling the increased flow generated by the completed facility. Indeed, at the time of contracting, these two permits were considered so critically important that either party could terminate the agreement if both permits were not obtained within six months:

> 2.1. . . . Waterscape shall cause the [facility] to be constructed in a good and workmanlike manner[,] . . . provided that Waterscape is allowed by EPD (i) to jointly permit in the name of the County both [the existing Fowler plant] and the [facility] and obtain a new increased LAS Permit therefore *and* (ii) to receive the requisite [CWD] permit as part of that process (collectively, "EPD Conditions"). If either of the EPD [c]onditions are not met within six (6) months of the execution of this Agreement, this Agreement shall be null and void at the written election of either party made prior to the satisfaction of both EPD Conditions; and in the event of such timely election by either party neither party shall thereafter have any further rights, obligations, or responsibilities hereunder, except for those arising under Section 2.8[1]. . . .
>
> 2.2. . . . The [facility] construction will start within six (6) months after satisfaction of the aforesaid EPD Conditions and shall be completed within twenty-four (24) months after the date of the execution of this Agreement by all parties.

*Waterscape's Obligation to Donate the Facility.* The parties further agreed that after constructing and completing the facility, Waterscape would operate the facility for a minimum of three months, after which it would "donate" the fully functioning facility

---

[1] Section 2.8 addressed Waterscape's indemnification obligations and provided in relevant part:

> Waterscape hereby indemnifies and agrees to hold the County harmless from and against any and all claims that may arise as a result of Waterscape's construction of all or any part of the Project, including but not limited to personal injury claims, tortuous interference with contract claims, and claims by contractors, materialmen, architects, and any other parties having claims or lien rights against the Project by reason of any labor or materials supplied in connection with the construction of the Project prior to Donation. . . .

to the county. Specifically:

> 2.6. . . . Upon satisfactory completion of the [facility] and successful operation thereof within design parameters for a minimum of three (3) consecutive months, the entire [facility], including but not limited to all necessary appurtenant easements and infrastructure for the [facility] and its associated collection and distribution systems, . . . will be donated and deeded "fee simple" to the County in an unencumbered, lien-free condition ("Donation"). Waterscape will provide written notice to the County of the intended date of Donation at a minimum of twenty (20) days prior to the intended date of Donation so that the County may consider its buy-out rights under Section 7.

Upon donation of the facility, the county would become responsible for its "operation, maintenance, and repair" (subject to certain limitations not relevant here), and would "provide monthly sewer service to all present and future [c]ustomers" of the facility.

*The County's Buy-Out Right.* Under the agreement, if Waterscape had not yet collected its total agreed-upon compensation by the time the facility was completed and donated to the county, the balance owed to Waterscape could be paid in one of two ways at the county's election. Under the first option, the county could continue collecting the developers' fees and contributions and remit those funds, along with accrued interest, to Waterscape in due course. Under the second option, the county could buy out Waterscape's residual compensation rights by immediately paying the balance using its own funds. The buy-out provision stated in pertinent part:

> Notwithstanding anything provided herein to the contrary, the County shall have the right — upon giving written notice to Waterscape at least ten (10) days prior to Donation of its election under this Section 7 — to buy out all of Waterscape's post-Donation rights for a payment in cash or equivalent funds at the time of the Donation equal to the balance of the unpaid Total Tap Fee Compensation, subject to all adjustments [resulting from change orders].

Hence, if the county chose to exercise its buy-out right at the time of donation, the county could end the parties' relationship: Waterscape would receive its total monetary compensation, and the county would receive the facility.

*Performance of the Agreement.* Following the execution of the agreement, the EPD issued an expanded LAS permit that allowed for

the discharge of byproducts from the facility. The LAS permit was issued to the "Forsyth County Department of Water and Sewer" and did not make reference to Waterscape.

Significantly, a CWD permit for the facility was not obtained within six months of execution of the agreement or thereafter. Although according to the agreement, the failure to obtain the CWD permit could result in either party declaring the agreement null and void, Waterscape proceeded with the construction of the facility. Waterscape also began collecting fees and contributions from third-party developers, which were held in an escrow account from which Waterscape could make draws to pay project-related expenses during the course of construction. Construction progressed to the point that the facility "began treating all flow generated in the James Creek basin" in February 2006. Thereafter, on June 20, 2006, the EPD issued its letter authorizing operation of the facility pursuant to the LAS permit, and a "ribbon-cutting" ceremony was held on that same date.

*The Change Order Dispute.* During the course of construction of the facility, certain changes to the project resulted in the parties agreeing to Change Order No. 1, totaling $544,824. A few days before the ribbon-cutting ceremony, Waterscape formally submitted Change Order No. 2, totaling $389,238.80. The county agreed that a portion of Change Order No. 2 — $123,581 — should be added to Waterscape's compensation, but disputed the remaining amount of $265,657.80.

On July 6, 2006, counsel for Waterscape sent an e-mail to the county threatening that Waterscape would "terminate the Agreement" unless the county agreed to approve the full amount of Change Order No. 2 requested by Waterscape; accept the donation of the facility within 14 days and take over operations within the same period; and exercise its buy-out right under the agreement. By letter dated July 17, 2006, the county agreed to immediately accept donation of the facility and exercise its buy-out right, if Waterscape would agree to a reduced total of $123,581 for Change Order No. 2.

*Waterscape's Termination Letters.* On July 19, 2006, counsel for Waterscape notified the county by letter that Waterscape "ha[d] elected to terminate" the agreement. According to the letter, Waterscape was exercising its right under Section 2.1 of the agreement to terminate because the EPD had not issued a CWD permit for the facility within six months of execution of the agreement. The letter emphasized that Waterscape had "not donated" the facility and that it would "continue to own and operate the [F]acility until such time that the County and Waterscape can reach an acceptable agreement." In an accompanying letter, counsel for Waterscape stated

that termination also was justified because the county allegedly had breached the agreement and had violated its implied duty of good faith and fair dealing by failing to approve the requested Change Order No. 2 in its entirety.

After terminating the agreement, Waterscape continued operating the facility and using the county's permits and wastewater disposal infrastructure. Currently, Waterscape serves more than 1,100 occupied homes. Waterscape also has collected over $11,000,000 in fees and contributions from third-party developers.[2]

*The Litigation.* The county brought suit against Waterscape seeking specific performance of the donation and buy-out provisions of the agreement, breach of contract damages, and expenses of litigation. In support of its claims, the county alleged that Waterscape's termination of the agreement was invalid and that its failure to donate the facility in accordance with the agreement constituted a material breach of contract. The county also stated that upon verification from Waterscape of the remaining compensation owed to it under the agreement, the county was ready, willing, and able to tender that amount in the trial court registry in anticipation of specific performance of the agreement. In subsequent pleadings, the county indicated that it was ready, willing, and able to pay the full amount requested by Waterscape in Change Order No. 2 in return for specific performance.

Waterscape answered and asserted multiple counterclaims. Among other counterclaims, Waterscape sought a declaratory judgment that it had validly terminated the agreement; a declaratory judgment that it was entitled to a perpetual easement by estoppel to use the county's permits and wastewater disposal infrastructure; and an injunction to prevent the county from interfering with its use of the permits and infrastructure.

Following discovery, the county moved for summary judgment on its claim for specific performance and on the three counterclaims asserted by Waterscape. After receiving voluminous filings and hearing oral argument from both parties, the trial court denied the county's motion for summary judgment on its claim for specific performance and on the three counterclaims asserted by Waterscape. Acting sua sponte, the court granted summary judgment in favor of Waterscape on the three counterclaims. This appeal followed.

1. The county argues that the trial court erred by sua sponte granting summary judgment to Waterscape on the counterclaims

---

[2] It is unclear from the record whether the collected fees and contributions are being held in escrow by Waterscape.

because the county was not provided proper notice prior to entry of summary judgment.

> Nothing in the applicable law places a burden on the nonmovant to respond to issues which are not raised in the motion for summary judgment. But a trial court may grant summary judgment sua sponte under certain circumstances, so long as it ensures that the party against whom summary judgment is rendered is given full and fair notice and opportunity to respond prior to entry of summary judgment.

(Citation and punctuation omitted.) *Stephens v. Alan V. Mock Constr. Co.*, 302 Ga. App. 280, 288 (3) (690 SE2d 225) (2010). "While in most cases it is better practice to await a motion for summary judgment before entering it for a party, it may not be erroneous under the circumstances of a given case, where the issues are the same as those involved in the movant's motion." (Citation omitted.) Id.

Here, the county moved for summary judgment on Waterscape's counterclaims, and the issues raised by the counterclaims were addressed by both parties in their pleadings and during an oral hearing. The trial court noted specifically that it was addressing the county's motion for summary judgment on Waterscape's counterclaims. The issues ruled upon by the trial court were the same as those involved in the county's motion, and the county was given full and fair notice and an opportunity to respond to Waterscape's claims. Under these circumstances, the court's sua sponte ruling was not error for that reason. As held in Divisions 2 and 3 below, however, the trial court did err in granting summary judgment to Waterscape on the merits of those counterclaims.

2. The trial court erred in concluding that Waterscape was entitled to summary judgment on its counterclaim for a declaratory judgment that its termination of the agreement was valid. Waterscape presents two arguments for why it validly terminated the agreement on July 19, 2006. First, Waterscape argues that it validly terminated under Section 2.1 of the agreement based upon the failure of the EPD to issue the CWD permit. Second, Waterscape argues that it was entitled to terminate based on the county's alleged bad faith in refusing to pay Change Order No. 2 in its entirety. In response, the county argues, among other things, that Waterscape had waived its right to terminate under Section 2.1 by not exercising its termination right within the time frame specified in the agreement. The county further argues that Waterscape was not entitled to terminate for the county's alleged bad faith because the refusal to pay all of the requested amount of Change Order No. 2 did not

constitute a material breach of contract. We agree with the county on both grounds.

(a) The uncontroverted evidence shows that Waterscape waived its right to terminate under Section 2.1 of the agreement as a matter of law. It is well established that a party to a contract may waive a contractual provision for his or her benefit. *Euler-Siac v. Drama Marble Co.*, 274 Ga. App. 252, 254 (1) (617 SE2d 203) (2005).

> A waiver may be express, or may be inferred from actions, conduct, or a course of dealing. Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights. Acting on the theory that the contract is still in force, as by continuing performance, demanding or urging performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute waiver of a breach. However, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist.

(Citation omitted.) *Greater Ga. Life Ins. Co. v. Eason*, 292 Ga. App. 682, 687 (2) (665 SE2d 725) (2008). A protracted delay in failing to exercise an option to terminate can support an inference of waiver. See *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 257-258 (3) (381 SE2d 322) (1989); see also *DuPree v. South Atlantic Conference of Seventh Day Adventists*, 299 Ga. App. 352, 354-355 (683 SE2d 1) (2009). "While normally the question of waiver is a matter for the jury, where, as here, the facts and circumstances essential to the waiver issue are clearly established[,] waiver becomes a question of law." *Mauldin v. Weinstock*, 201 Ga. App. 514, 520 (4) (411 SE2d 370) (1991); see also *Patel v. Gingrey Assoc.*, 196 Ga. App. 203, 206 (3) (395 SE2d 595) (1990).

In the present case, the waiver issue turns on the proper construction of the agreement. "The cardinal rule of construction is to ascertain the intention of the parties." OCGA § 13-2-3. "Where the terms of the contract are clear and unambiguous, the court looks only to the contract to find the parties' intent." (Citation, punctuation and footnote omitted.) *Quality Foods v. Smithberg*, 288 Ga. App. 47, 51 (1) (653 SE2d 486) (2007). Furthermore, parts of a contract must be read in conjunction with one another so as to harmonize the various parts. See *Knott v. Knott*, 277 Ga. 380, 382 (2) (589 SE2d 99) (2003). The proper construction of a contract is a question of law for determination by the court. *Collier v. State Farm &c. Ins. Co.*, 249 Ga. App. 865, 866 (2) (549 SE2d 810) (2001).

When Section 2.1 of the agreement is read in conjunction with Section 2.2, it is clear that the purpose of the permitting conditions set forth in Section 2.1 was to allow the parties to abort the contract at the outset, *prior* to commencing construction of the facility. Section 2.2 specifically provides that "[t]he [facility] construction will start within six (6) months *after* satisfaction of the aforesaid [permitting conditions]." (Emphasis supplied.) Hence, the plain and unambiguous language of the agreement shows that the parties contemplated that construction of the facility would begin if, and only if, the permitting conditions set forth in Section 2.1 were satisfied first.

In arguing for a different interpretation, Waterscape highlights the language in Section 2.1 stating that "in the event of such timely election by either party [to terminate the agreement for failure to obtain the LAS and CWD permits,] neither party shall thereafter have any further rights, obligations, or responsibilities hereunder, *except for those arising under Section 2.8.*" (Emphasis supplied.) According to Waterscape, the reference to Section 2.8 contained in Section 2.1 showed that the parties intended to retain the right to terminate even after construction of the facility had begun, since Section 2.8 set forth the indemnification obligations of Waterscape resulting from its prior "construction of all *or part* of the [facility]." (Emphasis supplied.)

We are unpersuaded. Waterscape's interpretation of the agreement would render the "after" clause of Section 2.2 (facility construction will start within six months *after* satisfaction of the permitting conditions) mere surplusage and meaningless. "[I]t is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." (Citations and punctuation omitted.) *Pomerance v. Berkshire Life Ins. Co. &c.*, 288 Ga. App. 491, 494 (1) (654 SE2d 638) (2007).

Waterscape's interpretation of its indemnification obligations under Section 2.8, moreover, is too narrow. In addition to other claims, that section broadly covers "claims by contractors, materialmen, architects, and any other parties having claims or lien rights . . . by reason of any labor or materials supplied in connection with the construction of the [facility]." Contrary to Waterscape's suggestion, such claims could potentially arise before construction commenced. For example, an architect could have a breach of contract claim for providing design specifications and plans long before construction actually began, and third-party suppliers likewise could have a breach of contract claim for materials ordered from them and supplied for the project in anticipation of future construc-

tion. Thus, Section 2.8 places indemnification obligations upon Waterscape for potential claims arising even before construction commenced, and, as a result, can be construed in a manner that is in harmony with both Section 2.1 and Section 2.2.

In addition to its argument predicated on Section 2.8 of the agreement, Waterscape emphasizes that it was required to complete the facility in 24 months under the agreement, and alleges that, as a practical matter, it would not have been able to meet this deadline if it had waited to begin construction until after the permits had been issued. Waterscape contends that the agreement should not be interpreted to mean that construction would begin only after the permitting conditions set forth in Section 2.1 had been satisfied.

Again, we are unpersuaded. Waterscape's interpretive argument predicated on its alleged inability to complete the construction could only be established through the use of parol evidence. However,

> [w]here the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties. Such a contract is the only evidence of what the parties intended and understood by it. Parol evidence is not admissible to contradict or construe an unambiguous contract.

(Citations and punctuation omitted.) *Safe Shield Workwear v. Shubee, Inc.*, 296 Ga. App. 498, 501 (3) (675 SE2d 249) (2009). Because the terms of the agreement are clear and unambiguous, Waterscape cannot vary those terms by resorting to parol evidence. See id.

Based on the foregoing, we conclude that the parties intended that any termination for failure to satisfy the permitting conditions set forth in Section 2.1 would occur prior to the beginning of construction of the facility. But it is uncontroverted that Waterscape began construction of the facility. In fact, Waterscape completed construction, obtained authorization to operate the facility from the EPD, and began serving customers, all before invoking the termination provision for the first time in July 2006, after becoming embroiled in a dispute over payment. Accordingly, the uncontroverted evidence demonstrates that Waterscape waived its right to terminate the agreement under Section 2.1 and that its purported termination under that section therefore was invalid as a matter of law.

(b) The uncontroverted evidence likewise shows that Waterscape was not entitled to terminate the agreement for the county's alleged bad faith in refusing to pay all of the requested amount of Change Order No. 2. Even assuming that the county's refusal to pay the full

amount requested by Waterscape constituted a breach of contract,[3] it was not a material breach that would authorize rescission or termination of the agreement.

"Generally, one injured by [a] breach of a contract has the election to rescind or continue under the contract and recover damages for the breach." *Western Contracting Corp. v. State Highway Dept.*, 125 Ga. App. 376, 384 (3) (187 SE2d 690) (1972). But to justify rescission, there must be a "material nonperformance or breach" by the opposing party. See *Jones v. Gaskins*, 248 Ga. 510, 511-512 (1) (284 SE2d 398) (1981); see also OCGA § 13-4-62. If the breach is not material, the party is limited to a claim for damages and cannot rescind the contract. See *Lanier Home Center v. Underwood*, 252 Ga. App. 745, 746 (1) (557 SE2d 76) (2001).

A breach is material when it is "so substantial and fundamental as to defeat the object of the contract." *Lanier Home Center*, supra, 252 Ga. App. at 746 (1); see also *Gen. Steel v. Delta Bldg. Systems*, 297 Ga. App. 136, 140 (2) (676 SE2d 451) (2009); *Lager's, LLC v. Palace Laundry*, 247 Ga. App. 260, 263 (1) (543 SE2d 773) (2000). In other words, "to trigger the right to rescission, the act failed to be performed must go to the root of the contract." *Gen. Steel*, 297 Ga. App. at 140 (2), n. 13. "A breach which is incidental and subordinate to the main purpose of the contract does not warrant termination[.]" (Citations, punctuation and footnote omitted.) Id. at 140 (2); see also *Lager's, LLC*, supra, 247 Ga. App. at 263 (1).

There is no genuine issue of material fact over whether the county's refusal to pay all or part of the final $265,657 requested by Waterscape as part of Change Order No. 2 was a material breach. The primary object of the agreement was the construction of a fully functioning facility that would serve customers in the James Creek basin of the county. There is no allegation, however, that the county's refusal to pay the final $265,657 prevented Waterscape from completing construction of a fully functioning facility that would service those customers.

Indeed, despite the dispute over payment, Waterscape completed construction of the facility, obtained authorization to operate from the EPD, began serving customers, and continues to operate the facility while serving more than 1,100 occupied homes. Furthermore, a dispute regarding the final $265,657 of a construction contract involving more than $11,000,000 in compensation for Waterscape[4] —

---

[3] We need not decide whether the county's refusal was a breach of contract for purposes of this appeal and express no opinion on the issue.

[4] The Total Tap Fee Compensation owed to Waterscape under the agreement was $10,614,000. The parties agreed that Waterscape was owed an additional $544,824 under Change Order No. 1 and at least an additional $123,581 under Change Order No. 2.

an amount representing approximately two percent of the total contract price — was not "so substantial and fundamental as to defeat the object of the [agreement]." *Lanier Home Center*, supra, 252 Ga. App. at 746 (1); see *Glower v. Orthalliance, Inc.*, 337 FSupp.2d 1322, 1333 (II) (C) (N.D. Ga. 2004) (applying Georgia law and concluding that breach of contract was not material, where the party "lost $8,000 out of a revenue stream that totaled more than $1,000,000 over the life of the contract" and "the underlying purpose of the contract was not thwarted").

There is no genuine issue as to whether the county materially breached the agreement. Waterscape's allegations are at most "evidence of a breach which was incidental to the purpose of the [agreement]." *Lager's, LLC*, supra, 247 Ga. App. at 263 (1); see also *Glower*, supra, 337 FSupp.2d at 1333 (II) (C). It follows that Waterscape was not authorized to rescind or terminate the agreement based upon the dispute over how much it should be paid under Change Order No. 2.

For the combined reasons set forth in subsections (a) and (b) of this Division, the trial court erred in granting summary judgment to Waterscape on its counterclaim for a declaratory judgment that it had validly terminated the agreement. The trial court should have ruled that Waterscape's termination was invalid as a matter of law and entered summary judgment in favor of the county on the counterclaim.

3. The trial court also erred in concluding that Waterscape was entitled to summary judgment on its counterclaims for a declaratory judgment that it enjoyed a perpetual easement by estoppel to utilize the county's permits and wastewater disposal infrastructure, and for an injunction preventing the county from interfering with its use of the permits and infrastructure. The uncontroverted evidence shows that Waterscape had a revocable license rather than a perpetual easement and was not entitled to a declaratory judgment in its favor or an injunction.

A license "is defined as authority to do a particular act or series of acts on land of another without possessing any estate or interest therein." (Citations and punctuation omitted.) *Henson v. Airways Svc.*, 220 Ga. 44, 53 (2) (136 SE2d 747) (1964). An express oral license may ripen into an easement based on equitable estoppel if the license holder expends funds in reliance on the grant. See *Berolzheimer v. Taylor*, 230 Ga. 595, 600 (198 SE2d 301) (1973); *Waters v. Ellzey*, 290 Ga. App. 693, 696 (2) (660 SE2d 392) (2008). As a general rule, however, a license is revocable at any time. *Harper Investments v. Dept. of Transp.*, 251 Ga. App. 521, 525 (2) (554 SE2d 619) (2001).

The plain and unambiguous language of the agreement demonstrates that the county granted Waterscape nothing more than a

license that was intended to be revoked upon termination of the agreement, upon the failure of Waterscape to perform its contractual duties, or upon the donation of the facility to the county, whichever happened first.[5] As previously noted, Section 2.1 provided that upon termination of the agreement, Waterscape would no longer have "any further rights, obligations, or responsibilities hereunder," except for its indemnification obligations. Likewise, Section 2.3 provided that if Waterscape failed to perform its contractual duties, the county would be entitled to take over the facility, and Waterscape would be required to "promptly donate and deed to the County the entire [p]roject, including but not limited to all necessary appurtenant easements and infrastructure for the [facility] and its associated collection and distribution systems." Employing similar language, Section 2.6, the donation provision, stated that Waterscape would donate to the county the entire facility, "including but not limited to all necessary appurtenant easements and infrastructure for the [facility] and its associated collection and distribution systems."

"Under the limitations, restrictions, and conditions of the [agreement]," it is clear that Waterscape was granted a revocable license to use the county's permits and wastewater disposal infrastructure. *Henson*, supra, 220 Ga. at 53 (2). In other words, Waterscape "acquired only a license to use [the permits and infrastructure] for the purpose stated, during the period specified in the contract." (Citations and punctuation omitted.) Id.

Waterscape, however, also argues that separate and apart from the agreement, the LAS permit issued by the EPD granted it a license that has ripened into a perpetual easement by estoppel. We do not agree. Under the LAS Permit, the EPD granted the county the right to operate the facility and did not mention Waterscape. The LAS permit therefore cannot be said to have granted Waterscape an express license. Consequently, because the doctrine of easement by estoppel "does not apply to implied licenses," the permit could not serve as the basis for an easement by estoppel claim. *Decker Car Wash v. BP Products &c.*, 286 Ga. App. 263, 267 (649 SE2d 317) (2007).

Lastly, Waterscape argues that it has "vested rights" to the county's permits and wastewater disposal infrastructure because it is a third-party beneficiary of the LAS Permit. It is certainly true

---

[5] To the extent that Waterscape bases its estoppel claim upon alleged representations by the county made prior to execution of the agreement, we note that the agreement contained a merger clause. A party cannot rely on representations made prior to the execution of a contract containing a merger clause to support an equitable estoppel claim. See *Tampa Bay Financial v. Nordeen*, 272 Ga. App. 529, 534 (2) (612 SE2d 856) (2005).

that "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9-2-20 (b). But a third-party beneficiary theory cannot support recovery unless there is an underlying *contract*. See *Gilbert v. Van Ord*, 203 Ga. App. 660, 661 (417 SE2d 390) (1992). And the LAS Permit did not create a contract between the EPD and the county. See, e.g., *City of LaGrange v. Troup County Elec. Membership Corp.*, 200 Ga. App. 418, 420 (1) (408 SE2d 708) (1991). Waterscape's "vested rights" argument is therefore misplaced.

For these reasons, the trial court committed error by granting summary judgment to Waterscape on its counterclaims regarding the grant of a perpetual easement and injunctive relief. The trial court should have concluded that Waterscape enjoyed nothing more than a revocable license and entered summary judgment in favor of the county on these two counterclaims.[6]

4. The trial court denied summary judgment to the county on its claim for specific performance of the donation and buy-out provisions of the agreement based on its conclusion that the county had failed to show either (a) that "it performed all of its obligations under the contract" or (b) that it had no adequate remedy at law. The trial court's conclusion was erroneous.

(a) The trial court did not elaborate as to how the county failed to show that "it performed all of its obligations under the contract," but Waterscape argued in the court below that the county had not fulfilled its contractual obligations by making a certain and unconditional tender of the full amount of compensation owed to Waterscape. As argued by Waterscape, the general rule is that a party seeking specific performance must have fulfilled his part of the bargain by making a formal, unconditional tender of the full amount of the purchase price owed. See *Jolly v. Jones*, 201 Ga. 532 (1) (40 SE2d 558) (1946); *Fox Run Properties v. Murray*, 288 Ga. App. 568, 573 (2) (b) (654 SE2d 676) (2007). Significantly, however, "the party bound to make the tender or perform the obligation may be relieved, and the tender and obligation held to have been waived, where the other party to the contract repudiates it, by act or word." (Citation and punctuation omitted.) *Eichelkraut v. Camp*, 236 Ga. App. 721, 725 (2) (513 SE2d 267) (1999). Here, in July 2006, Waterscape expressly stated that it was terminating the agreement and was not donating the facility to the county. Given this, the county was

---

[6] Given our resolution of the easement by estoppel claim, we need not address the county's additional argument that such a claim cannot be applied against a governmental entity such as the state or a county.

relieved of its duty to make a formal tender of payment to Waterscape as a matter of law. See id.

(b) Waterscape also argued that the county was not entitled to specific performance because the county had an adequate legal remedy in that it could seek monetary damages or exercise its eminent domain powers. These arguments are without merit. "Specific performance of a contract, if within the power of the party, will be decreed, generally, whenever the damages recoverable at law would not be an adequate compensation for nonperformance." OCGA § 23-2-130. It is well established that monetary damages are not an adequate legal remedy where, as here, the contract sought to be enforced involved the sale of unique real property. See, e.g., *Black v. American Vending Co.*, 239 Ga. 632, 634 (2) (238 SE2d 420) (1977) (noting that "the law regards [the sale or lease of real property] as sufficiently unique that equity will enforce a contract for its sale or lease"); *F. & W. Grand &c. v. Eiseman*, 160 Ga. 321, 331 (127 SE 872) (1925) (courts will decree specific performance of a contract for the sale of real property "as a matter of course"). Also, the fact that a governmental entity may have eminent domain powers does not require that entity to sacrifice otherwise valid contractual rights and undertake a costly eminent domain proceeding as if the contract had never existed. The county therefore did not have an adequate remedy at law.

For these reasons, the trial court erred in concluding that the county failed to show that it performed all of its contractual obligations or that it had no adequate remedy at law and in denying summary judgment on those specific grounds. Waterscape, however, raised numerous additional arguments as to why the county's motion for summary judgment on its specific performance claim should be denied, including that the buy-out price was inadequate and uncertain; that the real estate in question was not identified with sufficient clarity; that the agreement was unfair, unjust, and against good conscience; that the county had unclean hands and acted in bad faith; and that performance of the agreement was barred by laches and the impossibility of performance by Waterscape. These arguments were not addressed by the trial court and were not discussed by either party in their briefs on appeal. We therefore remand for the trial court to consider in the first instance Waterscape's additional arguments concerning whether the county should be granted summary judgment on its claim for specific performance. See *Plymel v. Teachers Retirement System*, 281 Ga. 409, 414-415 (5) (637 SE2d 379) (2006); *City of Gainesville v. Dodd*, 275 Ga. 834, 839 (573 SE2d 369) (2002); *United Healthcare of Ga. v. Ga. Dept. of Community Health*, 293 Ga. App. 84, 92-93 (2) (d) (666 SE2d 472) (2008).

*Judgment reversed and case remanded with direction. Phipps and Adams, JJ., concur.*

DECIDED MARCH 16, 2010 —
RECONSIDERATION DENIED APRIL 12, 2010 —

*Kilpatrick Stockton, Curtis A. Garrett, Jr., Matthew H. Patton,* for appellant.
*George E. Butler II, Bruce M. Edenfield,* for appellee.