**SECOND DIVISION
BARNES, P. J.,
MCFADDEN and MCMILLIAN , JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/**

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A2381. SOUTHERN TELECOM INC. v. TW TELECOM INC. OF GEORGIA L.P. et al.     McF-111

McFADDEN, Judge.

This dispute is about the interpretation of certain contracts for the creation of telecommunications networks in Atlanta and Birmingham, Alabama. Those contracts were entered in the 1990s between the parties' predecessors in interest. Appellant Southern Telecom and its predecessors are affiliates of the Southern Company, whose subsidiaries own power lines, power poles, conduits, rights-of-way and related equipment. Appellees TW Telecom Inc. of Georgia LP and TW Telecom of Alabama LLC (together, "TW"), like their predecessors, are in the telecommunications business. TW's predecessors contracted to run cable and fibers along power lines and rights-of-way and through conduits belonging to Southern Telecom's affiliates in the

Atlanta and Birmingham areas. Under the terms of those contracts Southern Telecom is entitled to a share of the revenue generated over TW's predecessors' Atlanta and Birmingham telecommunications networks.

The parties now disagree about the scope of the telecommunication networks from which Southern Telecom's fee is calculated. The subject networks are identified and their scope is defined in the subject contracts. Those definitions specify how the subject networks at issue are to be distinguished from other networks to which they are interconnected. The subject networks are defined broadly, and the definitions contemplate future growth through expansion.

But the parties did not bargain for growth through acquisition, which is what has occurred. When the TW entities acquired their predecessors in interest, they had preexisting networks of their own in Atlanta and Birmingham. Southern Telecom now claims a right to share in the revenues of those preexisting networks. We find no warrant for that claim in the contracts. The contractual definitions of the subject networks do not support that claim. We find instead that Southern Telecom's claim to revenue from the preexisting networks is controlled – and defeated – by the general rule that assignees' rights and obligations are no greater than their assignors'.

Ruling on cross motions for summary judgment, the trial court held that Southern Telecom's right to a share of revenues, and consequently to information needed to calculate amounts owed, is limited to the networks as they existed at the time the contracts were first assigned. The trial court properly rejected Southern Telecom's claim to revenue from TW's preexisting networks and properly ruled that TW was not required to provide financial records related to its preexisting networks. We therefore affirm.

1. *Facts.*

Summary judgment is appropriate when the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party."(Citations omitted.) *Forsyth County v. Waterscape Svcs.*, 303 Ga. App. 623 (694 SE2d 102) (2010).

So viewed, the record shows that Southern Telecom's predecessor entered a contract with ICG Telecom Group, Inc. ("ICGT") to construct and operate a telecommunications network in Atlanta using Georgia Power facilities, such as power

3

poles, conduits and rights-of-way. Another Southern Telecom predecessor entered a contract with ICG Access Services, Inc. to construct and operate a telecommunications network in Birmingham, Alabama, using Alabama Power facilities. The contracts contained provisions that entitled the Southern Telecom predecessors to a percentage of the revenues the TW predecessors generated from the sale of telecommunications services.

A. *The Atlanta Contract's Terms.*

In addition to a $5.5 million initial payment, the contract required ICGT to pay during the contract term a "Network Fee," which it defined as a "percentage[] of ICGT's On-Net Revenue." . The contract defined "On-Net Revenue" as "the gross revenue . . . received by ICGT or any of its Affiliates derived directly or indirectly from the sale of Telecommunication Services provided over the ICGT Network to Telecommunications Customers located in any On-Net Building by ICGT or any of its Affiliates." The contract defined "On-Net Building" as "any building, facility, plant, operation or structure in the Atlanta [area] directly or indirectly connected to the ICGT Network." The contract defined "ICGT Network" as:

> the digital telecommunications facilities of ICGT within the Atlanta
> [area], including, without limitation, the ICGT Fibers as well as other

fibers utilized by ICGT, associated equipment and other digital telecommunications facilities that directly or indirectly intersect or connect to any ICGT Fibers or Cable, whether existing on the date hereof or constructed hereafter.

(Although the contract did not define "digital telecommunications facilities," Federal Standard 1037C defines "telecommunications facilities" as "[t]he aggregate of equipment, such as radios, telephones, teletypewriters, facsimile equipment, data equipment, cables, and switches, used for providing telecommunications services." *Telecommunications: Glossary of Telecommunication Terms* at http://www.its.bldrdoc.gov/fs-1037//dir-036/_5352.htm.)

The contract goes on to distinguish between portions of the ICGT Network which were installed on Georgia Power facilities, which are called "Route Segments," and portions installed on facilities owned by entities other than Georgia Power, called "Alternate Route Segments." Southern Telecom was entitled to payments calculated on the basis of both, but smaller payments for Alternate Route Segments. The contract defined "Route Segments" as the portion of "fiber optic cable incorporating the ICGT Fibers, to be used by or installed for or on behalf of ICGT" on Georgia Power facilities. The contract required the parties to designate the Route Segments

on Exhibit A to the contract. Exhibit A, in turn, referred to and incorporated a map that set forth the build-out plan for the ICGT Network.

The contract provided that ICGT could propose Route Segments as additions to Exhibit A. Georgia Power could then accept or reject the proposed additions. If Georgia Power rejected a proposed addition, ICGT could use non-Georgia Power facilities, thereby creating an Alternate Route Segment. Alternate Route Segments were part of the ICGT Network, but "any On-Net Revenue generated by any On-Net Building connected to the ICGT Network by an Alternate Route Segment, would be reduced "for the purpose of calculating the Network Fee due Southern Telecom. . . ."

The contract contained a provision authorizing assignment by ICGT, should ICGT merge or sell all of its assets, "so long as the surviving entity or purchaser . . . assumes all of the obligations of ICGT." It also provided that it would be governed by Georgia law.

B. *The Birmingham contract's terms*

Although the Birmingham contract was similar to the Atlanta contract, it defined the revenue to which the Southern Telecom predecessor was entitled in a different manner. In addition to an initial fee of $2.375 million, the Birmingham

contract required ICG to pay over the contract term a "Bonus," which the contract defined as a "percentage of ICG's On-Net Telecommunications Revenues." It defined "On-Net Telecommunications Revenues" as revenues from six sources, five of which derived from the ICG Network. The sixth source of revenue, "all charges for non-switched point-to-point or point-to-multipoint connections," was independent of the ICG Network. The contract defined "ICG Network" as "[t]he digital telecommunications facilities of ICG within the Birmingham [area], including without limitation, both the ICG Fibers and associated equipment and other digital telecommunications facilities, whether existing on the date hereof or constructed hereafter."

The contract contained a provision authorizing assignment by ICG, should ICG merge or sell all of its assets, "so long as the surviving entity or purchaser . . . assumes all of the obligations of ICG." It also provided that it was governed by Alabama law.

2. *Assignments of the contracts.*

TW Georgia and TW Alabama ultimately acquired the contracts via assignment from Xspedius Communications LLC, which had purchased the contracts when the ICG entities went bankrupt. Southern Telecom consented to the assignments, but filed

7

this action in order to assert its rights in light of the assignments. Southern Telecom alleged that TW "fail[ed] to account for the full size" of the networks. The primary issue is whether the contractual revenue sharing provisions are applicable only to the revenue generated over the ICG networks as they existed at the time of the assignments or whether the revenue sharing provisions apply also to the revenues generated over the telecommunications networks of the companies that acquired the ICG entities.

3. *The applicable law.*

Under both the Alabama and the Georgia law of assignments, TW assumed the obligations of ICGT and ICG as they existed at the time of the assignments. Under the law of both states, an assignee "stands in the shoes" of the assignor and obtains no greater rights than the assignor possessed at the time of assignment. *Fouche v. Brower*, 74 Ga. 251, 264 (1885); *Pridgen v. Auto-Owners Ins. Co.*, 204 Ga. App. 322, 323 (419 SE2d 99) (1992); *Nissan Motor Acceptance Corp. v. Ross*, 703 So. 2d 324, 326 (Ala. 1997); 6A C.J.S. *Assignments* § 110.

> The assignee acquires all of the rights and remedies possessed by the assignor *at the time of the assignment*, and takes the obligation, contract, chose, or other thing assigned subject to the same restrictions, limitations, and defects as it had in the hands of the assignor.

8

(Emphasis supplied.) 6A C.J.S. *Assignments* § 110. "An assignment is intended to change only who performs an obligation, not the obligation to be performed." (Citation and punctuation omitted.) *Medtronic AVE v. Advanced Cardiovascular Systems*, 247 F.3d 44, 60 (II) (e) (3rd Cir. 2001). "[T]he assignee under a general assignment of an executory bilateral contract, in the absence of circumstances showing a contrary intention, becomes the delegatee of his assignor's duties. . . . " (Citations and punctuation omitted.) *Winkleblack v. Murphy*, 811 So. 2d 521, 526-527 (Ala. 2001). "Generally speaking, the assignee of a contract will be held to have assumed the assignor's obligations thereunder if he expressly or impliedly manifests an intention to become bound by those obligations." *High Point Sprinkler Co. v. George Hyman Constr. Co.*, 164 Ga. App. 706, 708 (1) (297 SE2d 757) (1982).

Georgia and Alabama cases hold that assignment is intended to change only *who* performs an obligation, not the obligation to be performed; they reject assignees' attempts to expand rights transferred from an assignor. See *Alabama Gold Life Ins. Co. v. Hall*, 58 Ala. 1, 6 (1877) ("each successive assignee will acquire all the rights of the assignor at the time of assignment, and no more"); *Algernon Blair, Inc. v. National Surety Corp.*, 222 Ga. 672, 673 (151 SE2d 724) (1966) ("the assignee has no more rights under the contract than the assignor would have in dealings with the

9

other contracting party"). The corollary to this rule applies equally to the other party to the original contract; its rights are neither enhanced nor diminished by assignment.

Thus, TW "stands in the shoes" of ICGT and ICG and assumed the obligations that ICGT and ICG owed Southern Telecom's predecessors at the time of the assignments. Therefore, the question is, what were ICG and ICGT's contractual obligations to Southern Telecom's predecessors at the time of the assignments?

In Georgia,

> where the terms of a written contract are clear and unambiguous, the court must look to the contract to find the intention of the parties -- not to matters outside the contract. It is also well established that a contract should be construed by examining the entire agreement, not by speculating about isolated words, clauses or provisions thereof. Further, the construction of a contract, unambiguous on its face, is a matter of law for the court, even though a party to the contract contends it should be construed differently.

(Citations omitted.) *Techwerks, Inc. v. Retail Techs. Corp.*, 235 Ga. App. 144, 145 (509 SE2d 84) (1998). "The contract . . . must be given a reasonable construction." *Georgia Power & Light Co. v. Waycross*, 181 Ga. 216, 221 (181 SE 575) (1935).

Alabama law is similar:

> Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written.

(Citation omitted.) *Winkleblack*, 811 So.2d at 527.

4. *The Atlanta contract: ICGT's obligations to the Southern Telecom predecessor at the time of assignment.*

At the time of assignment, ICGT was obligated to pay Southern Telecom's predecessor a percentage of gross revenue it received "directly or indirectly from the sale of Telecommunication Services provided over the ICGT Network." The contract does not contemplate – let alone obligate ICGT to pay a portion of – the revenue Xspedius or TW would receive for their sale of telecommunication services provided over Xspedius or TW networks. Under the plain terms of the contract, then, the obligation assumed by TW is the obligation to pay a percentage of the gross revenue ICGT was entitled to receive at the time of the assignment for the sale of telecommunications services over ICGT's network.

11

Southern Telecom argues that the definition of ICGT Network includes the telecommunications facilities of any other entity, including Xspedius and TW, if those facilities connect in any way to the ICGT Fibers or Cable. We reject this argument because it relies on an ambiguity in the definition of ICGT Network. As described above, the contract defined "ICGT Network" as:

> the digital telecommunications facilities of ICGT within the Atlanta [area], including, without limitation, the ICGT Fibers as well as other fibers utilized by ICGT, associated equipment and other digital telecommunications facilities that directly or indirectly intersect or connect to any ICGT Fibers or Cable, whether existing on the date hereof or constructed hereafter.

The expansive "including" language upon which Southern Telecom relies -- "including, without limitation, . . . other digital telecommunications facilities that directly or indirectly intersect or connect to any ICGT Fibers or Cable, whether existing on the date hereof or constructed hereafter" -- conflicts with the first part of the definition, "the digital telecommunications facilities *of ICGT* within the Atlanta [area]." (Emphasis supplied.) "If the apparent inconsistency is between a clause that is general and broadly inclusive in character and one that is more limited and specific in its coverage, the latter should generally be held to operate as a modification and

pro tanto nullification of the former." (Citation omitted.) *Central Georgia Electric Membership Corp. v. Georgia Power Co.*, 217 Ga. 171, 173-174 (121 SE2d 644) (1961). Further, "the established rule of construction that [is] in the event of a conflict, the first provision prevails over the latter ambiguous language." (Citation omitted.) *Vass v. Gainesville Bank & Trust*, 224 Ga. App. 259, 261 (480 SE2d 294) (1997). To interpret the definition of ICGT Network to include facilities of other entities simply because those facilities connect to ICGT Fibers or Cable conflicts with the more specific, first provision of the definition that the network consists of ICGT's digital telecommunications facilities in the Atlanta area. Consequently, the first, more specific provision prevails, and the ICGT Network consists of the digital telecommunications facilities of ICGT in the Atlanta area.

5. *Birmingham contract: ICG's obligations to the Southern Telecom predecessor at the time of assignment.*

Like the Atlanta contract, the Birmingham contract provided that Southern Telecom's predecessor was entitled to a percentage of "ICG's On-Net Telecommunications Revenues." ICG was required to pay a percentage of its revenue derived from certain specified sources, primarily dial-tone lines connecting customers in On-Net Buildings in Birmingham to the ICG Network. It was *not* obligated to pay

13

a percentage of revenue Xspedius or TW would receive for their sale of telecommunication services provided over their networks. Southern Telecom does not argue that a particular provision in the Birmingham contract captures the Xspedius and TW networks, as it does for the Atlanta contract. It simply argues that it is entitled to revenue generated over those networks by virtue of the assignments. As discussed in Division 6, infra, we disagree.

6. *The contracts' contemplation of growth in revenue does not encompass growth by assignment.*

Southern Telecom argues that the contracts themselves contemplated growth in revenue from the growth of the ICGT and ICG networks. But this fact does not alter the principle that the assignee assumes the assignor's obligations determined as of the date of the assignment. Southern Telecom cannot show that at the time of the assignments, ICGT and ICG derived revenue from the Xspedius or TW networks. Indeed, the contracts themselves included detailed procedures for adding Route Segments to the networks, and Southern Telecom points to no evidence that the parties followed those procedures for adding Xspedius or TW facilities to the networks. Those detailed procedures did not contemplate an expansion of the networks by assignment.

14

7. *TW's obligation to provide records.*

Consistent with its rulings on revenue sharing, the trial court correctly ruled that the scope of information TW was required to provide Southern Telecom was restricted to the records relating to revenue generated on the facilities built pursuant to the contracts.

*Judgment affirmed. Barnes, P. J., and McMillian, J., concur.*