**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed. Please refer to the Supreme Court of Georgia Judicial Emergency Order of March 14, 2020 for further information at (https://www.gaappeals.us/rules).**

**May 11, 2020**

# In the Court of Appeals of Georgia

A20A1033. CITY OF NORCROSS v. GWINNETT COUNTY, GEORGIA.

BARNES, Presiding Judge.

This appeal centers on a dispute between the City of Norcross (the "City") and Gwinnett County (the "County") over which local governmental entity is responsible for repairing and maintaining a drainage system located on commercial property that was initially located within the boundaries of the unincorporated County but was later annexed by the City. Following discovery, the trial court granted summary judgment to the County on its claim for declaratory relief and denied summary judgment to the City. The court concluded that while the drainage system originally had been dedicated to the County for public use, the City assumed responsibility for the repair and maintenance of the system by annexing the subject commercial property and/or

entering into an agreement with the County concerning the provision of stormwater utility services. The City now appeals. For the reasons discussed more fully below, we reverse.

> Summary judgment is appropriate if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. On appeal from the grant or denial of summary judgment, we conduct a de novo review, with all reasonable inferences construed in the light most favorable to the nonmoving party.

(Citations and punctuation omitted.) *Forsyth County v. Waterscape Svcs.*, 303 Ga. App. 623, 623 (694 SE2d 102) (2010). See OCGA § 9-11-56 (c).

So viewed, the record reflects that at the time of its initial development, the commercial property known as the Peachtree Corners Business Park was part of unincorporated Gwinnett County. Some of the properties within the business park included a system of pipes, drains, conduits, and related components that conveyed stormwater from surrounding properties into a detention pond (the "drainage system" or "system").

In October 1981, the parties that owned the properties where the drainage system was located and a company that held an easement in the system dedicated the

2

system to the County by way of a recorded instrument entitled "Dedication of Drainage System and Detention Pond" that was executed by those parties and the County (the "Dedication"). The Dedication stated that the property owners and easement holder

> do hereby (i) dedicate to [the County] for the use of the public an easement in perpetuity over, across, under and through [portions of their respective properties] for the purposes of using, maintaining, repairing and operating the Detention Pond and drainage system located therein and in those drainage systems located on [certain recorded subdivision plats] which drain into the Detention Pond; (ii) grant, bargain, sell, transfer, assign and convey to [the County] for the use of the public all easements which have previously been reserved by any of the Grantors or their predecessors for the purpose of using, maintaining, repairing and operating any portion of the Detention Pond and drainage system located therein as well as the drainage systems emptying into the Detention Pond; and (iii) convey to [the County] for the use of the public the interest of Grantors in all pipes, drains, conduits, detention facilities and other equipment and fixtures located in the Detention Pond and drainage systems.

The Dedication further recited:

> The [County] hereby accepts the dedication described herein and the assignments and conveyances of the easements and other property as described herein for the use of the public and agrees to maintain and

3

repair the Detention Pond and drainage systems described herein and to be fully responsible for such from and after the date hereof.

Additionally, the Dedication stated: "This instrument shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns."

In 2005, the General Assembly amended the Charter of the City to expand the City's limits to encompass portions of the business park. See Ga. L. 2005, p. 3876. The annexation included the properties in the business park where the drainage system was located.

In 2008, the City adopted a series of stormwater management ordinances. See City of Norcross Code of Ordinances §§ 36-132 to 36-140 (the "Norcross Code"). With respect to the scope of the City's responsibility for stormwater management systems and facilities, the Norcross Code provided:

(a) The city owns or has rights established by written agreements which allow it to operate, maintain, improve and access those stormwater management systems and facilities which are located:

(1) Within public road rights-of-way;

(2) On private property but within easements granted to, and accepted by, the city, or are otherwise permitted to be located on such private property by written agreements for rights-of entry,

4

rights-of-access, rights-of-use or other permanent provisions for operation, maintenance, improvement and access to the stormwater management system facilities located thereon;

(3) On private property but within a public water influence zone after the city secures a right-of-entry, right-of-access, permanent easement, temporary easement or other form of written consent from the property owner;

(4) On land dedicated to, and accepted by, the city solely for the operation, maintenance, improvement and access to the stormwater management systems and facilities located thereon; or

(5) On public land which is owned by the city and/or land of another governmental entity upon which the city has agreements providing for the operation, maintenance, improvement and access to the stormwater management systems and facilities located thereon.

Norcross Code § 36-134 (a). The Norcross Code further provided:

Operation, maintenance and/or improvement of stormwater management systems and facilities which are located on private or public property not owned by the city, and for which there has been no written agreement granting easements, rights-of-entry, rights-of-access, rights-of-use or other form of dedication thereof to the city for operation, maintenance, improvement and access of such stormwater management and systems and facilities shall be and remain the legal

responsibility of the property owner, except as otherwise provided for by the state and federal laws and regulations.

Norcross Code § 134 (b).

In 2012, in accordance with the Georgia Service Delivery Strategy Act ("SDS Act"), OCGA § 36-70-20 et seq.,[1] the City and the County agreed to a service delivery strategy governing local services (the "Service Delivery Strategy"). As part

---

[1] As declared by the General Assembly,
The intent of [the SDS Act] is to provide a flexible framework within which local governments in each county can develop a service delivery system that is both efficient and responsive to citizens in their county. The General Assembly recognizes that the unique characteristics of each county throughout the state preclude a mandated legislative outcome for the delivery of services in every county. The process provided by [the SDS Act] is intended to minimize inefficiencies resulting from duplication of services and competition between local governments and to provide a mechanism to resolve disputes over local government service delivery, funding equity, and land use. The local government service delivery process should result in the minimization of noncompatible municipal and county land use plans and in a simple, concise agreement describing which local governments will provide which service in specified areas within a county and how provision of such services will be funded.
OCGA § 36-70-20. "The SDS Act prescribes a process for developing a local government service agreement, OCGA § 36-70-21, its required components, OCGA § 36-70-23, and criteria for its development, OCGA § 36-70-24." *City of Union Point v. Greene County*, 303 Ga. 449, 450 (812 SE2d 278) (2018), disapproved in part on other grounds by *City of College Park v. Clayton County*, 306 Ga. 301, 313 (2), n. 7 (830 SE2d 179) (2019).

of the Service Delivery Strategy, the County and the City agreed to provide "stormwater services" within their respective territorial boundaries. However, the record does not contain any written instruments conveying or assigning to the City the County's easements or other property interests in the drainage system located in the business park.

In March 2012, Meritex Atlantic Boulevard, LLC purchased property in the business park that included the eastern portion of the drainage system. The record does not contain any written agreements between the City and Meritex granting the City an easement or other rights of access to the drainage system located on the Meritex property.

In February 2018, two large sinkholes formed in the parking lot on Meritex's property that were caused by a damaged pipe that was part of the drainage system. Meritex made demands upon both the City and County to repair the drainage system, but both denied responsibility for its repair and maintenance. Meritex thereafter commenced the present suit against the County and City and several of their elected officials and officers in their official capacities. Meritex asserted claims for inverse condemnation and nuisance and sought damages, declaratory and mandamus relief, and attorney fees and litigation expenses.

The County and City both filed answers denying responsibility for repairing

and maintaining the drainage system. Following discovery, the County filed a motion

asserting that the undisputed facts showed that it was entitled as a matter of law to a

declaratory judgment that the City was responsible for repairing and maintaining the

drainage system based on the City's annexation of the business park and the parties'

Service Delivery Strategy.[2] The City subsequently filed a cross-motion for summary

judgment. The City did not dispute that it had responsibility for maintaining

stormwater utility equipment on public rights-of-way within its territorial boundaries.

But the City denied that it had responsibility for maintaining the draining system

---

[2] While the County styled its motion as a "motion for declaratory judgment," "[t]here is no magic in nomenclature, and we judge pleadings, motions and orders not by their name but by their function and substance," and its motion was in essence a motion for summary judgment on a claim for declaratory relief. *Nelson & Hill, P. A. v. Wood*, 245 Ga. App. 60, 64 (2) (537 SE2d 670) (2000). As we have explained, "where a party seeking a declaratory judgment contends that he is entitled to judgment based on the facts or allegations currently of record, he may move . . . for summary judgment pursuant to OCGA § 9-11-56 (a)." (Citation and punctuation omitted.) *McLeod v. Clements*, 298 Ga. App. 553, 554 (2) (680 SE2d 602) (2009). See OCGA § 9-11-56 (a) ("A party seeking . . . to obtain a declaratory judgment may, at any time after the expiration of 30 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof."). That is what occurred here, where the County sought entry of declaratory relief after discovery based on the affidavits, depositions, and documentary evidence currently in the record and prior to any trial of the case.

8

located on the interior of the Meritex property, asserting that the County had retained ownership of the drainage system easements after the annexation and thus was still responsible for the maintenance of that system.

The trial court granted the County's motion and denied the City's motion, concluding that the City became responsible for the drainage system when it annexed the commercial property where the system was located. In so ruling, the trial court acknowledged that in *Fulton County v. City of Sandy Springs*, 295 Ga. 16 (757 SE2d 123) (2014), the Supreme Court of Georgia held that Fulton County retained responsibility over two drainage detention ponds and a dam located on private property within the City of Sandy Springs because the county had been granted easements to the ponds by the property owners and the county had failed to show that the easements had been abandoned, terminated, or legally transferred to the city. However, the trial court held that *Fulton County* was inapposite based on the court's conclusion that the drainage system in the present case was conveyed to the County by way of a public dedication rather than an easement. The trial court further concluded that even if the County retained an ownership interest in the drainage system, the City assumed responsibility for maintaining the system based on the Service Delivery Strategy.

9

On appeal from the trial court's summary judgment rulings, the City contends that the trial court erred in concluding that *Fulton County,* 295 Ga. 16, was distinguishable from the present case.[3] According to the City, *Fulton County* controls the outcome and should have resulted in the grant of summary judgment to the City and the denial of summary judgment to the County. We agree.

*Fulton County*, 295 Ga. 16, involved a dispute over which local governmental entity was responsible for repairing and maintaining two drainage detention ponds and a dam located on private property that was originally part of unincorporated Fulton County but was later made part of the City of Sandy Springs. In the 1970s, before the ponds and dam had been built and when the land was still part of unincorporated Fulton County, a dispute arose between several homeowners and the county over drainage problems, and the county agreed to build two detention ponds on the land. Id. at 16. The homeowners expressly granted Fulton County two easements to build and maintain the detention ponds on the land "as part of the public drainage system," and the county also condemned a small parcel of land to enable the construction. Id. Fulton County then built a dam and ponds on the land. Id.

---

[3] Meritex did not file a response to the County and City's cross-motions seeking summary judgment as to which governmental entity was responsible for the drainage system, and Meritex has not participated in the current appeal.

Thereafter, the City of Sandy Springs was created by the General Assembly, and the land where the dam and ponds were located was made part of the city. Id. When the dam and ponds went into disrepair, Sandy Springs sued Fulton County, seeking a determination as to which government was responsible for maintaining the dam and ponds. Id. The trial court ruled that Fulton County retained an obligation to maintain the dam and ponds even though the land now fell within Sandy Springs, and the Supreme Court agreed with the trial court on that point. Id. at 17.

In concluding that Fulton County had retained responsibility for the maintenance of the dam and ponds, the Supreme Court noted that the county undisputedly still owned the easements in question and had taken no steps to transfer them to Sandy Springs. *Fulton County*, 295 Ga. at 17. The Supreme Court further explained that "[a]s a general rule, the holder of an easement is responsible for repairs to the easement when the use of the easement is impaired due to lack of maintenance," and that "the easements in question explicitly enable[d] maintenance to be performed by Fulton County." (Citation and punctuation omitted.) Id. Accordingly, the Supreme Court held that Fulton County, as the owner of the

11

easements, would retain the responsibility to repair and maintain the dam and ponds until its easements had been legally transferred, terminated, or abandoned. Id. at 17.[4]

In so holding, the Supreme Court rejected Fulton County's argument that the county was prohibited from maintaining the easements by Article IX, Section II, Paragraph III of the Georgia Constitution, which states that a county cannot provide "[s]torm water and sewage collection and disposal systems . . . inside the boundaries of any municipality . . . except by contract within the municipality . . . affected."[5]

---

[4] Noting that the easements could be legally transferred, terminated, or abandoned in the future, the Supreme Court disagreed with the trial court to the extent that its order could be read to indicate that Fulton County had to maintain the easements in perpetuity. *Fulton County*, 295 Ga. at 18.

[5] The constitutional provision provides in relevant part:

   (a) In addition to and supplementary of all powers possessed by or conferred upon any county, municipality, or any combination thereof, any county, municipality, or any combination thereof may exercise the following powers and provide the following services:

   . . .

   (6) Storm water and sewage collection and disposal systems. . . .
   (b) Unless otherwise provided by law,

   (1) No county may exercise any of the powers listed in subparagraph (a) of this Paragraph or provide any service listed therein inside the boundaries of any municipality or any other county except by contract within the municipality or county affected. . . .

1983 Ga. Const., Art. IX, Sec. II, Para. III.

12

*Fulton County*, 295 Ga. at 17. The Supreme Court reasoned that Fulton County's constitutional argument was misplaced because the county was not being required to provide an "ongoing 'storm water and sewage collection and disposal system' in the absence of an intergovernmental contract," but was merely being required to maintain the structures on the easement that it continued to own in accordance with general property-law principles. Id. at 17. The Supreme Court also rejected Fulton County's argument that the easements owned by the county automatically terminated when the property became part of Sandy Springs, pointing out that "property such as parks and public buildings must be separately transferred from one [governmental] entity to the other," see OCGA § 36-31-11.1, and that the county had "pointed out no statute or law which would indicate that an easement over private property automatically terminates when a city has been created." *Fulton County*, 295 Ga. at 18.

*Fulton County* is controlling in the present case because Gwinnett County, like Fulton County, was expressly granted easements over private property for the purposes of using, maintaining, repairing, and operating a drainage system, and the conveyance instrument explicitly stated that the County would maintain the system. Although the trial court sought to distinguish *Fulton County* on the ground that the drainage system "was dedicated to the County by way of public dedication rather than

13

an easement," a public dedication of property often consists of the grant of an easement across the subject property,[6] as occurred here by express written instrument. And while a public dedication of land can be implied under certain circumstances without the naming of a specific grantee as the holder of the interest in the dedicated property,[7] the present case involved an express dedication in which Gwinnett County

---

[6] See *Wiggins v. Southern Bell Tel. & Tel. Co.*, 245 Ga. 526, 529 (1) (266 SE2d 148) (1980) (noting that "the dedication of property can consist of the dedication of either an estate in, or an easement across, the dedicated property"); *Northpark Assocs. No. 2. v. Homart Dev. Co.*, 262 Ga. 138, 140-141 (2) (414 SE2d 214) (1992) (applying presumption that dedication of road to county transferred an easement).

[7] See *Teague v. City of Canton*, 267 Ga. 679, 680 (2) (482 SE2d 237) (1997) ("To prove a dedication of land to public use, there must be an offer, either express or implied, by the owner of the land, and an acceptance, either express or implied, by the appropriate public authorities or the general public.") (citation and punctuation omitted); *Chatham Motorcycle Club v. Blount*, 214 Ga. 770, 775 (1) (107 SE2d 806) (1959) ("The only essential elements of a valid dedication of lands to the public are, (1) an intention of the owner to dedicate to a public use, and (2) an acceptance thereof by the public. It is not essential to constitute a valid dedication to the public that the right of use should be vested in a corporate body. There is no particular form of making a dedication. It may be done in writing, or by parol; or it may be inferred from his the owner's acts, or implied, in certain cases, from long use. A grant is not necessary; and [d]edications of lands for charitable and religious purposes, and for public highways, are valid without any grantee to hold the fee.") (citations and punctuation omitted). See also OCGA 44-5-230 ("After an owner dedicates land to public use either expressly or by his actions and the land is used by the public for such a length of time that accommodation of the public or private rights may be materially affected by interruption of the right to use such land, the owner may not afterwards appropriate the land to private purposes.").

14

was named as the grantee of the easements. Consequently, the conveyances in the present case and in *Fulton County* are not materially distinguishable from one another, and therefore the framework enunciated in the latter case controls. It follows that, pursuant to *Fulton County*, Gwinnett County, as the owner of the easements, retained responsibility for the repair and maintenance of the structures on those easements (i.e., the drainage system), unless its easements were abandoned, terminated, or legally transferred. See *Fulton County*, 295 Ga. at 17.

Because the County did not argue in the trial court that it had abandoned the easements for the drainage system, that issue has been waived for purposes of appeal. See *Fulton County*, 295 Ga. at 18. Nor has the County pointed to any statutes or laws indicating that county-owned easements or other county-owned property located on private land automatically terminate when a municipality annexes the private land. Indeed, Chapter 36 of Title 36 of the Georgia Code addresses annexation by local governments, and OCGA § 36-36-7 (b) sets out the general rule that "ownership and control of county owned public properties and facilities are not diminished or otherwise affected by annexation of the area in which the county owned public property or facility is located." OCGA § 36-36-7 (c) creates an exception for land

15

located on both sides of a county road right-of-way,[8] and OCGA § 36-36-7 (d) sets out the conditions that must be satisfied for a municipality to acquire county property or facilities located "within an area annexed by [the] municipality [that] is no longer usable for service to the unincorporated area of the county as the result of the annexation."[9] However, the damaged drainage system was under a parking lot on the

[8] OCGA § 36-36-7 (c) provides:
Whenever a municipality annexes land on both sides of a county road right of way, the annexing municipality shall assume the ownership, control, care, and maintenance of such right of way unless the municipality and the county agree otherwise by joint resolution.

[9] OCGA § 36-36-7 (d) provides:
Whenever county owned property or a county owned facility within an area annexed by a municipality is no longer usable for service to the unincorporated area of the county as a result of the annexation, the annexing municipality shall be required to acquire said property from the county governing authority under the following conditions:
(1) The annexation must be final;
(2) The county property or facility must be funded by revenues derived from the unincorporated areas of the county and must be used to provide services solely to the unincorporated areas of the county;
(3) The county adopts a resolution declaring that the property or facility is no longer usable for service to the unincorporated area of the county as a result of the annexation; and
(4) Unless otherwise provided by mutual agreement, the county shall be compensated in an amount equal to the fair market value of the property or facility which is no longer usable for service to the unincorporated area. If the county and municipality fail to agree as to the fair market value of the property or facility within 180 days following adoption of the resolution required by paragraph (3) of this subsection,

16

Meritex property, not along a county road right-of-way as contemplated by OCGA § 36-36-7 (c). Nor is there any evidence in the record to suggest that the conditions set forth in OCGA § 36-36-7 (d) were satisfied. Accordingly, the County failed to come forward with any evidence that its easements over the Meritex property had been terminated.

Nor is there any evidence in the record that the easements were legally transferred from the County to the City by means of an assignment or other written conveyance instrument. However, in moving for summary judgment, the County asserted that the City agreed to provide stormwater utility services within the City's territorial boundaries as part of the parties' Service Delivery Strategy, and that such services included repairing and maintaining the drainage system on the Meritex property. The trial court agreed with the County, concluding that "even if the dedication (or easement) still belongs to the County, based on the agreement with the County, the City would still be responsible for operation and maintenance of the stormwater management facilities" on the Meritex property. We disagree in light of the record in this case.

the question of fair market value shall be submitted to a special master appointed by the superior court of the county in which the property or facility is located for determination of value.

17

Notably, a copy of the intergovernmental agreement executed by the City and County for implementing the Service Delivery Strategy was not made part of the record on summary judgment. See generally OCGA § 36-70-21 ("Each county and municipality shall execute an agreement for the implementation of a local government service delivery strategy as set forth in this article[.]"). Rather, the record includes only a check-the-box form submitted by the County's Chief Assistant County Attorney to the Georgia Department of Community Affairs[10] with an attached "stormwater services" map of the "service area of each service provider," and neither the summary form nor the map define "stormwater services." Compare *City of Union Point*, 303 Ga. at 451, n. 3 (in addition to the forms used to file the parties' service delivery strategy with the Department of Community Affairs, the record contained the underlying intergovernmental agreements governing services between the county and municipalities). Nor did the County submit an affidavit in conjunction with the form and map explaining their terms. The County, "as the party alleging that a contract exist[ed], [had] the burden of proving its existence and its terms." (Citation and

---

[10] See OCGA § 36-70-26 ("Each county shall file the agreement for the implementation of strategy required by Code Section 36-70-21 with the department."). See also OCGA § 36-70-2 (defining "Department" as "the Department of Community Affairs of the State of Georgia").

18

punctuation omitted.) *Swanstrom v. Wells Fargo Bank*, 325 Ga. App. 743, 744 (2) (754 SE2d 786) (2014). And "[a] contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain." (Citation and punctuation omitted.) *Burns v. Dees*, 252 Ga. App. 598, 601-602 (1) (a) (557 SE2d 32) (2001). Here, the County failed to point to any evidence in the record reflecting the specific terms of its agreement with the City and whether the agreement addressed the repair and maintenance of stormwater equipment located on private property over which the County held easements.

Moreover, the City's Director of Public Works, Utilities, and Parks averred that she was "not aware of any negotiations or discussions with Gwinnett County concerning the City of Norcross taking responsibility to maintain the stormwater infrastructure within the [business park], including the [Meritex] Property," after the annexation. She further testified in her deposition that she was unfamiliar with any specific terms in the Service Agreement relating to stormwater services, and that the City repairs stormwater components at the right-of-way, not in the interior of commercial properties. The City Manager testified in his deposition that the City only repairs stormwater components at the right-of-way, that the City does not own the drainage system on the Meritex property, and that he only recalled an agreement

19

during annexation about stormwater services delivered at the right-of-way.[11] Given this affidavit and deposition testimony and the absence of the agreement executed by the parties implementing the Service Delivery Strategy or any other evidence reflecting its specific terms, the County failed to come forward with evidence sufficient to create a genuine issue of material fact as to whether the easements over the Meritex property had been legally transferred to the City or whether the City had otherwise contractually assumed responsibility for maintaining the drainage system.[12]

In sum, the uncontroverted record in this case shows that based on the easements granted to the County over the Meritex property, the County was responsible for the repair and maintenance of the drainage system. Furthermore, the County did not argue that the easements had been abandoned and failed to come

---

[11] The City Manager noted in his deposition that the City bills the Meritex property for stormwater services but that the funds are used "to replace things that are on the right-of-way." As previously noted, the City did not dispute that it was responsible for maintaining stormwater utility equipment at public right-of-ways that were within the City's territorial boundaries. See Norcross Code § 36-134 (a) (1).

[12] We also note that the Norcross Code specified that the City would maintain stormwater systems and facilities on private property or property owned by another governmental entity if the City had a written agreement granting it easements, rights-of-entry, rights-of-access, rights-of-use, or some other form of dedication for the operation, maintenance, improvement, and access to the system and facilities. See Norcross Code § 36-134 (a) (2), (4), (5), (b). No such agreement is included in the record in this case, as noted above.

forward with any evidence to show that the easements had been terminated or legally transferred. Hence, based on the existing record, the County retained responsibility for maintaining the drainage system following the annexation by the City. The trial court therefore erred in granting summary judgment to the County on its declaratory judgment claim and in denying summary judgment to the City.

*Judgment reversed. Gobeil and Pipkin, JJ., concur.*